

The following constitutes
the order of the court. Signed March 14, 2014

William J. Lafferty, III
U.S. Bankruptcy Judge

# UNITED STATES BANKRUPTCY COURT
## NORTHERN DISTRICT OF CALIFORNIA
### OAKLAND DIVISION

| | |
|---|---|
| In re | Case No. 09-71053 |
| Lance E. Hart, | Chapter 7 |
| Debtor. | |
| | |
| Gary Drew & Janette Drew, | Adversary No. 12-04058 |
| Plaintiffs, | |
| v. | |
| Lance E. Hart, | |
| Defendant. | |
| | |
| In re | Case No. 11-42424 |
| Debra A. Hart, | Chapter 7 |
| Debtor. | |
| | |
| Gary Drew & Janette Drew, | Adversary No. 11-04175 |
| Plaintiffs, | |
| v. | |
| Debra A. Hart, Clyde E. Hart, Lance E. Hart, New Horizons Investments, Inc., | |
| Defendants. | |

*United States Bankruptcy Court, Northern District of California*

**MEMORANDUM OF DECISION REGARDING PLAINTIFF GARY & JANETTE DREW'S CONSOLIDATED ADVERSARY PROCEEDINGS AGAINST DEFENDANTS DEBRA A. HART AND LANCE E. HART**

This is an action by Plaintiffs Janette and Gary Drew (the "Drews") against Defendants Debra Hart ("Debra"), Lance Hart ("Lance"), and New Horizon Investments, Inc. ("NHII") for determination of the amount of debt owed, and for determination that the debt is non-dischargeable pursuant to the provisions of Sections 523(a)(2)(A) (fraud, false pretenses) and (a)(4) (defalcation by one acting in a fiduciary capacity, embezzlement) of the United States Bankruptcy Code (hereafter, the "Code"). This matter was tried along with *Karaeff v. Hart*, Adv. Pro. No. 11-04177, with which it had been consolidated, on April 1-4, May 5 and 6, and August 5, 6, 8 and 9, 2013.[1]

## SUMMARY OF DISPOSITION

For the reasons set forth below, the Court rules as follows:

With respect to the causes of action for fraud pursuant to 11 U.S.C. Section 523(a)(2)(A), the Court finds and concludes that although the Plaintiffs have established the elements for relief under Section 523(a)(2)(A) with respect both to the Plaintiffs' initial investment of $100,000 in July 2004 (the "July 2004 Investment") and the $100,000 advanced in March 2007 (the "March 2007 Advance") against Debra and NHII, both actions are subject to a defense based upon the applicable statute of limitations. Because relief against Lance under Section 523(a)(2)(A) was predicated solely on the acts of Debra, Clyde E. Hart, and NHII, and not on any independent misrepresentations by Lance, the statute of limitations defense also operates as a bar to any action against Lance.

With respect to the causes of action against Debra, Lance, and NHII under Section 523(a)(4) for defalcation while acting in a fiduciary capacity, the Court concludes that the Plaintiffs demonstrated the elements of such a claim against NHII, but not against Debra or Lance.

---

[1] By contemporaneous filing, the Court is separately disposing of the *Karaeff v. Hart* matter via a Memorandum Decision to be entered in that proceeding.

2

With respect to the causes of action against Debra and Lance under Section 523(a)(4) for embezzlement, the Court finds and concludes that the Plaintiffs have failed to prove an essential element of such claims as to both Defendants.

## PROCEDURAL HISTORY

Lance filed a chapter 7 bankruptcy on November 18, 2009, and received a discharge on February 22, 2010.  Debra filed a chapter 7 bankruptcy on March 4, 2011, and received a discharge on April 17, 2012.

On June 4, 2011, the Drews filed this adversary proceeding against Debra, Clyde Hart, Lance, and NHII.  On June 6, 2011, Beverly Karaeff filed an adversary proceeding against Debra, Clyde Hart, Lance, Two Harts, Inc., Two Harts Construction & Development Inc., and NHII.

Motions to dismiss were filed in both adversary proceedings by Lance, Clyde Hart, and Two Harts Construction.  These non-debtor defendants argued the Court did not have jurisdiction to enter a judgment against them, and a judgment could not be rendered nondischargeable against them because they were not debtors in the related bankruptcy case.  The Court granted both motions and dismissed the adversary proceedings as to these non-debtor defendants.

Lance's bankruptcy case was re-opened on February 17, 2012, to allow two adversary proceedings to be filed.  Both proceedings were filed on March 7, 2012.  One was filed by the Drews against Lance.  The other proceeding was filed by Beverly Karaeff against Lance.

On March 20, 2012, a motion to consolidate proceedings was filed by the respective Plaintiffs in each adversary proceeding.  The Defendants opposed the motions to consolidate and a hearing was held on October 16, 2012, at the conclusion of which the Court consolidated the four adversary proceedings.  Orders consolidating the proceedings were entered on October 25, 2012.

In November 2012, a motion for leave to amend the complaint was filed in both adversary proceedings brought by Beverly Karaeff, and the adversary proceeding brought by the Drews

3

against the Harts.   Shortly thereafter, in the Drews' adversary proceeding and the adversary proceeding brought by Karaeff against the Harts and their related entities, the Court approved a stipulation allowing the Plaintiffs to amend the Complaint.

In February 2013, Lance Hart and Debra Hart brought separate motions for summary judgment against Gary Drew and Janette Drew, and against Beverly Karaeff in the consolidated adversary proceedings.   A hearing was held on March 7, 2013, and the motion was granted in part and denied in part.   In partially granting the motion, the Court ruled that since there was no evidence that Lance had personally made any false statements to the Drews, he could not have any direct liability under Section 523(a)(2)(A), but that Plaintiffs might proceed under applicable theories of imputed liability.   Although counsel for the Defendants/prevailing parties neglected to upload an order granting the motion, the parties tried the matter in accordance with the Court's ruling.

The matters were tried on April 1 - 4, May 6 - 7, and August 5, 6, 8 and 9, 2013.   On August 8, 2013, the Plaintiffs moved to amend their Complaint according to proof, which Defendants opposed.   After considering the pleadings filed and the arguments of counsel, the Court granted the motion to amend the Complaint by memorandum entered September 6, 2013.   Prior to that ruling, the First Amended Complaint was filed on August 27, 2013.[2]   At the conclusion of the presentation of Plaintiffs' affirmative case in the trial, Defendants moved for a Judgment on partial findings pursuant to Federal Rule of Bankruptcy Procedure 7052.   The Court granted that motion in part with respect to an aspect of the claims asserted by Kareaff, as set forth

---

[2] Although the Plaintiffs had, in open court on August 8, 2013, presented dismissals of certain causes of action against the Defendants, each First Amended Complaint ("FAC"), filed by Karaeff and the Drews respectively on August 27, 2013, contained those purportedly dismissed causes of action.  In the Drews' case, a claim against Debra for embezzlement arising from the $100,000 paid to Toby on March 19, 2007, was dismissed.  A claim against Lance for embezzlement and defalcation arising from both the $100,000 paid to GTP Properties on June 30, 2004, and the $100,000 paid to Toby on March 19, 2007, was also dismissed.  However, the First Amended Complaint nonetheless contained causes of action under section 523(a)(4) for embezzlement and fraud and defalcation while acting in a fiduciary capacity relating to these facts.  Defendants and Plaintiffs agreed to the form of the FAC with respect to the purported dismissals and the Court adjudicates the FAC as filed.  Defendants did not object to the form of the FAC on grounds that it failed to comport to the dismissals.  For the purpose of establishing the clearest record, and because the result of these proceedings is not changed by the exercise, the Court adjudicates the FAC as filed.

4

in detail in the Memorandum Decision entered in that proceeding ("Karaeff Memorandum").

The Court received post-trial briefs from the parties on October 15, 2013, and December 20, 2013. On October 16, 2013, Defendants moved to amend their answers to add certain affirmative defenses, which Plaintiffs opposed. The Court granted the Defendants' motion to amend, and Defendants' filed their Amended Answer on January 31, 2014, at which point the matter was finally submitted.

## I. FACTS[3]

The claims in this matter have their genesis in a failed real-estate development involving property located at 317 Shady Glen Road, Walnut Creek, California ("Shady Glen"), and a limited partnership formed for the ostensible purpose of acquiring and developing Shady Glen, GTP Properties, Ltd. ("GTP").

The facts underlying these claims are complicated by virtue of the number of individuals and entities involved in the transactions between the parties, and because of the relatively lengthy period of time between the Plaintiffs' initial involvement with the Shady Glen project and the trial of these matters.

Reaching an understanding of the facts was also complicated by the parties' strikingly divergent versions of numerous critical events and circumstances. Perhaps that is to be expected in any trial involving numerous allegations of fraud and breach of fiduciary duty. What was particularly striking to the Court, however, was the consistent failure of Debra, and her husband Clyde E. Hart (referred to throughout the trial as "Toby", and so referred to here), to present a credible version of the facts underlying these disputes. Moreover, their demeanor as witnesses during the trial alternated between defensive, evasive, and combative. The substance of their answers was frequently undercut by inconsistent prior deposition testimony and other discovery responses, as well as a general inability to provide sensible, rational and believable explanations for their conduct throughout the relevant transactions. In short, the Court found their testimony

---

[3] The following facts constitute the Court's findings of fact pursuant to Federal Rule of Bankruptcy Procedure 7052.

5

to be not at all credible on many crucial points, as will be reflected in particular instances discussed in detail below.

### A. The Harts and Their Entities

#### 1. The Hart Family

Debra has been a licensed real estate broker in California for over thirty years, with experience in the Walnut Creek area since 1985. She has, over time, worked at a number of different real estate brokerages. Toby, who is not currently a debtor in bankruptcy, and is not a defendant in this adversary proceeding, is also a licensed real estate broker in California.[4] Toby has also had extensive experience remodeling and building homes since 1978, and has had some experience in developing real estate projects. Toby served as President and CEO of Moss & Moss Realtors during the early 1980's, while also working on real estate-related projects. In 1985, Toby and Debra relocated to the East Bay, and Toby became Regional Vice President, Real Estate division, for Great Western Bank ("GWB"), from 1985 through 1996. Although Toby retired from his job at GWB in 1996, he has continued to buy, develop, build and sell real estate from 1996 until the present. Toby's post-retirement projects included continued work in the home repair and remodeling field, initially as a roofer, under the guise of a number of different corporate entities. As time went on, Toby branched out into more extensive remodeling and construction jobs, again via the use of various corporate entities. Lance is Toby and Debra's son, and has been involved with his father in his various roofing, remodeling and construction businesses since he was sixteen years old. Lance is a licensed contractor. At the time of the trial, Lance was employed by Two Harts Construction and Development, Incorporated, a company which he owns. Trial Tr., 206:3, 7, 217:8-25, Apr. 2, 2013.

---

[4] Toby Hart is a defendant in an action currently pending in state court, *Gary and Janette Drew v. Clyde E. Hart*, No. 12-00759 (Contra Costa County Superior Court, filed March 29, 2012).

Case: 11-04175    Doc# 187    Filed: 03/14/14    Entered: 03/14/14 16:49:05    Page 6 of 55

### 2. New Horizon Investment Inc.

NHII is a suspended California corporation. It was formed initially in September 2002 by Debra as a vehicle through which to receive income from her real estate sales commissions to minimize her tax liability. Debra was originally the President of NHII, and appeared to remain in that role through at least March 2004. Although the testimony at trial was less than crisp, the Harts contended that Toby became the President of NHII at or around the time of the formation of GTP in June 2004, and Debra became Secrerary of NHII at that time. As of June 2004, Debra and Toby jointly owned a sixty percent (60%) equity interest in NHII; Lance owned the remaining forty percent (40%) equity. Although Debra claims to have divested herself of her equity interest in NHII and to have resigned as an officer of NHII as of May 2006, both of those assertions were challenged by the Plaintiffs. Lance served as Chief Financial Officer and Vice-President of NHII during the period of formation of GTP and throughout the transactions covered herein, and was the only person authorised to write checks against NHII's checking account. Those facts notwithstanding, the testimony of the Harts at trial was that Lance had no particular expertise or background in financial matters, took direction from Toby on all matters involving NHII, including payables, and had no awareness whatsoever of the existence of GTP, in which NHII was the sole general partner, until the commencement of this litigation.

### 3. Two Harts, Inc.

Two Harts, Inc. ("Two Harts") was a California corporation formed originally by Troy Hart, Lance's brother, to work on construction projects. The original shareholders were Troy and his wife Margaret. Prior to the commencement of construction on the Shady Glen project, Margaret was removed as a shareholder in Two Harts, and Lance took her place. Lance later placed his contractor's license into Two Harts, and used the company to work on various real estate projects, including Shady Glen, for which Two Harts was the construction supervisor and general contractor. Trial Tr., 52:1-2, Apr. 4, 2013; Trial Tr., 43:9-21, Aug. 6, 2013.

### 4. Transactions Between the Harts and NHII

Plaintiffs introduced some evidence respecting the close relationships between and among the members of the Hart family, NHII and Two Harts. In particular, with respect to NHII, the company is clearly a family business, and run as such. The Harts appear not to have observed all of the corporate formalities, including convening regular formal meetings or keeping minutes of such meetings, but the Court recognizes that certain "formalities" may be somewhat relaxed in a family setting. The evidence is undisputed that the company, which the Harts began using in connection with several real estate remodeling and construction projects in 2004, was not formally capitalized at the time of incorporation. However, Debra did apparently repeatedly put her real estate commissions into the company and Toby and Lance contributed profits from real estate projects. Debra, Lance and Toby each also allegedly loaned money to NHII, but no contemporaneous records were kept to distinguish between what would have constituted equity investments and what would have been fairly termed loans.

Debra and Toby Hart's residence, at 125 Canada Via Way, Diablo, CA ("Canada Via"), was initially acquired by NHII via Grant Deed from Donn and Jeannie McKnight dated May 3, 2004. Pls.' Trial Ex. 5. The property was later transferred from NHII to Debra and Toby via Grant Deed dated October 7, 2005. Pls.' Trial Ex. 24. NHII maintained its business office at Canada Via, and NHII's phone number was the same as the residence.

In addition, Lance's house on Hutchinson Road was also held in the name of NHII, and when Lance sold his former residence at Beale Court, which had also been a remodeling project for NHII, he deposited over $400,000 of his "profit" from that sale into a NHII checking account.

Although Plaintiffs claimed that moneys moved freely between and among Debra, Lance, NHII, and Two Harts, in fact, there was little direct evidence about the treatment of funds held by NHII. For example, although Plaintiffs introduced summary bank statements for NHII's checking account at Washington Mutual Bank ("WAMU") for periods commencing January 2006, and those statements include references to electronic transfers and checks during that period, there was no more specific evidence, such as, for example, detail about the electronic

8

transfers or copies of cancelled checks, to address specifically the issue whether funds deposited into NHII's accounts were inappropriately transferred to third parties. There was no indication that copies of cancelled checks for NHII's checking account were not available, and could not have been produced at trial to support Plaintiffs' assertions. There was however, substantial discussion concerning an alleged theft of the books and records of NHII and GTP from a storage facility located at 1100 Bancroft Road, Walnut Creek, that happened to have been the residence of Kyrille Mendelson ("Mendelson"), a long-time business associate of the Harts. It was not clear to the Court whether copies of NHII cancelled checks were part of the stolen documents.

Over the years, Debra, Toby and Lance worked jointly on a number of real estate projects. Some of the projects on which the Harts worked were for their own account: Lance's former residence on Beale Road in Walnut Creek began as a project on which he did substantial remodeling. When the project was complete and take-out financing was acquired, the property was deeded into NHII, which took the financing as "profit" on the deal, and Lance used the property as his residence. Similarly, Canada Via, Debra and Toby's home during the relevant period for these matters, was a substantial remodeling and construction project undertaken by Toby and Lance, and was owned initially by NHII. The financing on this project was underwritten by Donn McKnight ("McKnight", or with his wife Jeannie, the "McKnights"), who had been involved with the Harts in a number of prior real estate transactions. The McKnights' share of the "profit" on this project, and possibly other projects, was not paid to them in cash, but was rolled into a promissory note from Toby and Debra to the McKnights in the amount of $1,100,000 (the "McKnight Note"). Pls.' Trial Ex. 19.

## 5. Shady Glen.

In 2003, Debra assisted Eugene Wolsky ("Wolsky") in the acquisition of Shady Glen. Shady Glen was a 2.21 acre parcel of undeveloped land on a hill in Walnut Creek. By her own admission, Debra thought the property very special from the moment she first became aware of it. When it became apparent that Wolsky would not be able to develop Shady Glen, Debra arranged for the property to be sold to NHII. The parties entered into a "Vacant Land Purchase

Agreement," dated as of September 2, 2003, that called for the property to be transferred to NHII for a total price of $1,200,000, with a closing to occur on January 9, 2004. Pls.' Trial Ex. 1. Although Wolsky gave NHII a Grant Deed dated January 23, 2004, in fact the escrow for the transaction did not close, and the Deed was not recorded, until July 2, 2004, when NHII provided Wolsky the proceeds of a loan in the amount of $800,000 from Sequoia Mortgage Capital ("Sequoia"). Defs.' Trial Ex. 2.

### B.    Formation of GTP

Although the Harts had no experience in partnerships before the transaction which is the subject of this lawsuit, they decided to develop Shady Glen through GTP. With the assistance of counsel, they drafted a Private Placement Memorandum ("PPM"), Subscription Agreement ("SA") and Limited Partnership Agreement ("LPA") for GTP. GTP was formed on June 30, 2004, with NHII as the sole general partner. Pls.' Trial Ex. 11.

### 1.    The Private Placement Memorandum

The PPM was prepared primarily by Debra, and was clearly intended as an aid to those considering investing in GTP. Pls.' Trial Ex. 8. The PPM identifies GTP as a limited partnership created for the sole purpose of acquiring and developing Shady Glen, and states that the general partner of GTP, NHII, is in contract to purchase the property from a third party. The goal of the "Shady Glen Real Estate Project" was to have been to build, and ultimately sell to "third party buyers," two homes to be built on two lots. The PPM also states that the "Project" is estimated to take "approximately one year" from start ("i.e., the Limited Partnership's [GTP's] purchase of the Shady Glen Property") to finish (closing of sales of the homes). The PPM also states that through the efforts of NHII, the property has been approved for a lot split, and that design plans for two 5000 square foot houses are being considered.

The PPM goes on to state that the General Partner (NHII) is in contract to purchase Shady Glen, and that as part of the project, NHII will sell its entire interest in the property to GTP for $2,000,000 (the "Purchase Price"), and that upon payment of the Purchase Price, GTP would hold title to Shady Glen "free and clear". GTP would then enter into a fixed-price construction

10

contract for the construction of the two homes with a combined cost of $1,600,000. Four Hundred Thousand Dollars ($400,000) of the construction costs for each house would be released to the contractor on issuance of a building permit for each lot, and the remaining $400,000 would be released on "final sheet-rock inspection" on each lot. The total capital needed for the project was $3,600,000.

The PPM states that the General Partner shall raise the capital necessary by sale of 120 partnership units at $30,000 each. Thus, the entire capitalization of the partnership was to be raised by equity investments by partners. The PPM further states that the General Partner may, but is not obligated to, purchase partnership units if the offering is not fully subscribed. The PPM expressly states: "[In] the event that there remains an undersubscription of the Partnership Units, the General Partner would reject all investor subscriptions, promptly notify the subscribed investors of such rejection, and promptly return to the subscribed investors, in full, any subscription monies paid by them." Pls.' Trial Ex. 8, at 2.

The PPM also includes projections concerning the likely sales price and expenses of sale, and the resulting projected return on investment for the limited partners.

The PPM describes the General Partner as a California corporation whose shareholders are Toby and Debra Hart, as husband and wife, as to a sixty percent (60%) interest, and Lance Hart, as to a forty percent (40%) interest. Toby, Debra and Lance were identified as the directors of the corporation; Toby was President of the corporation, Debra was Secretary-Treasurer, and Lance was Vice-President.

As a further inducement to the potential investors, the PPM also describes the background of the Harts in real estate projects, and the roles they will be expected to play in this project, including Toby's prior experience in developing real property, Lance's experience in construction, and Debra's expertise in land acquisition, contract negotiations and marketing. Under "Risk Factors" the General Partner boasts that it "and its principals (the Hart family) have been buying, building, remodeling, and selling property in this specific area of Walnut Creek since 1985, and have recognized profits exceeding the above proposed" notwithstanding such

11

formidable obstacles as "Desert Storm, the 1989 earthquake, . . . the stock market crash, the 9-11 terrorist attack, PG&E's rolling blackouts and subsequent bankruptcy and the ousting/replacement of the Governor of California, Gray Davis, due to a bad California economy."  Pls.' Trial Ex. 8, at 4.

### 2. The Subscription Agreement

The SA changed the financial arrangements described in the PPM slightly, by decreasing the purchase price for each Partnership unit to $25,000 (for a total of 144 Units), but retained the over-all capital to be raised, solely via equity investments, at $3,600,000.  Indeed, the language quoted above from the PPM concerning the effect of an undersubscription of the Partnership was repeated verbatim in the second paragraph of the SA.

The SA contains an express prohibition against resale of the Partnership Units unless the Units become registered securities under the Securities Act of 1933, or unless the sale comes within an exception to the 1933 Act.  Pls.' Trial Ex. 10, at 3.

### 3. The Limited Partnership Agreement

Consistent with the provisions of the PPM and the SA, the LPA states that the sole purpose of the Partnership is to acquire and develop Shady Glen, and that the funds necessary for the project, the sum of $3,600,000, will be raised via the sale of equity investments to limited partners.  Pls.' Trial Ex. 11, at 7-9.  The LPA identifies NHII as the General Partner, and gives the General Partner fairly standard powers of control and management of Partnership operations and assets.  Pls.' Trial Ex. 11, at 1, 9-10.  The LPA also copies, verbatim, the language found in the PPM and SA concerning the Partnership's acquisition of Shady Glen from the General Partner via a Land Purchase Agreement (a copy of which was not attached to the LPA) for $2,000,000, and the payment of $1,600,000 to the General Partner as the costs of construction for two custom-built homes on the property, via a Construction Contract to be entered into with NHII (a copy of which was also not attached to the LPA).  Pls.' Trial Ex. 11, at 1, 7-8.

Section 4.6(b) of the LPA expressly prohibits the General Partner from taking any action that will "make it impossible to carry on the ordinary business of the Company, or which would

12

likely defeat the purpose of the Company as provided under Section 2.3 above." Pls.' Trial Ex. 11, at 11.

The LPA does define "contributions" to the Partnership to include, at the General Partner's discretion, cash and promissory notes to the extent of their fair market value. Pls.' Trial Ex. 11, at 4.

### C. The Transactions between the Harts and Drews

#### 1. Background

The Harts advertised the opportunity to invest in GTP, and Debra testified that she received hundreds of inquiries. Janette Drew inquired about the project, and in response, Debra sent Janette via fax a letter with a copy of the PPM attached. The cover letter states, in part: "We need your response to this by Wednesday, June 23rd. We are available and excited to show you the property, the area and our latest custom home in Diablo Country Club anytime through next weekend, June 27th. **All monies must be deposited by June 28th for a close of escrow on the land July 1, 2004."** (Emphasis added). Pls.' Trial Ex. 7. At some time after June 23 and before June 28, Debra met with the Drews at the property, and they walked over the site and discussed the opportunity. Janette Drew testified, emphatically, that Debra made a number of statements during this meeting that dealt with not only the unique and valuable nature of the project, but also the lack of any risk, because the project's expenses, including the cost of acquiring the property and construction were to be funded *solely* by equity from the limited partners, and there was to be no debt on the project.

#### 2. The July 2004 Investment

Based upon these representations, as well as their understanding of the transactions and the project as set forth in the PPM, the SA and the LPA, the Drews were eager to invest $100,000 in GTP. On June 29, 2004, Debra wrote an email to Janette about the transaction, including the following language: "The lots record Friday a.m.7/2 [sic] i.e. they will no longer be in escrow as stated in the Private Placement Memorandum, which is why we extended the offering from 6/30 to 7/2 at close of business as all funds will be deposited in the Shady Glen account and the land is

13

ours!"  Pls.' Trial Ex. 9.  In response to Janette's inquiry whether she could make the investment over time, as opposed to delivering a lump-sum payment of $100,000, Debra wrote an email dated June 30, 2004, in which she stated that, having checked with "the Atty" [sic], she confirmed that the funds from the proposed limited partners needed to be certified, and GTP needed to have all of the Drews' investment funds deposited prior to the closing, "as it would put the Limited Partners and the project at risk if for some reason when the time to put up more funds came and you were unable to for any reason it then risks them as well as holds up the project."  Pls.' Trial Ex. 9.  In the same email, Debra goes on to say "We (New Horizon Investments, Inc.) are paying the balance of the original land loan off tomorrow, so we need the signed subscriptions & funds signed and in by Tues - July 6 to proceed as a Partnership instead of New Horizon."  Pls.' Trial Ex. 9.

The Drews came to Debra and Toby's home at Canada Via on July 1, 2004.  The purpose of this visit was to discuss further the GTP investment opportunity, and, as Debra's cover letter of June 18 offered, to view first-hand the quality of Toby and Lance's construction work.  During this meeting Debra and Toby provided them with copies of the PPM, the SA and the LPA, and Toby walked them through the provisions of the LPA.   The Drews both testified that during this meeting both Debra and Toby Hart repeatedly made the same oral representations about the financing for the project coming solely from equity investment into GTP, and that, in fact, they had already raised almost all of the money needed under the LPA.

In reliance on the contents of the documents, and the oral statements by Toby and Debra, the Drews signed the SA and LPA, and delivered a check in the amount of $100,000 to GTP on July 1, 2004.  Pls.' Trial Ex. 10, 11, 12.

From time to time thereafter, Janette Drew wrote to Debra to inquire about the status of the Shady Glen project, and whether title to the property had transferred to the Partnership.  On July 6, 2004, Janette wrote Debra an email: "Hi Debra - how is the project going?  Did title transfer ok to the partnership?"  Pls.' Trial Ex. 15.  Although Toby and Debra each testified that they responded to each email from Janette either via a direct contact (by phone), or a return

14

email, Janette testified, credibly, that she received no reply to this inquiry, and there is no record of any such reply. Toby's testimony that there were many other emails sent between him and Debra, on the one hand, and Janette, on the other, was imprecise, and frankly not at all credible.

Having received no response to this email, and having apparently been unable to get a response from Toby via telephone, Janette wrote another email to Debra on December 19, 2005: "Hi Debi I've left two messages for Toby regarding the status of Shady Glen and have not received a return phone call. Specifically Gary & I would like to know the current status and the new timetable for each of the houses. Additionally, per the LP Agreement, the land was to be placed under the LP title once the lot split was approved. Approval was this summer so I would like to know if that has occurred. Any other details would be great. Please respond as soon as possible. Thanks and the best of the holiday season to you!" Pls.' Trial Ex. 27. No response was received to this email either.

On September 8, 2006, Debra finally wrote an email to Janette, ostensibly replying to her prior inquiries: "Hi! THE BATTLES HAVE BEEN FOUGHT, WON AND THE SG WAR IS OVER! WE'RE FINALLY READY TO ROCK AND ROLL AND EVERYTHING EXCEPT WEATHER IS NOW IN OUR SOLE CONTROL!!!!!!!!!!!!!!!!!!!!!!!!!! Over the weekend, Toby will put together the exact plan of attack, time frames etc.-ideas, options our perspective and get it to you!" Pls.' Trial Ex. 36.

After an exchange of emails on September 14, 2006 in which Debra explained a delay in responding substantively due to the illness and death of a close friend, Debra wrote an email to Janette on September 24, 2006, in which she described the status of construction and the expected completion date for the house on Lot A of Shady Glen ("Lot A") (estimated to occur within eight months). Debra also shared that "We have the plans for the 2nd house in the final 'tweaking' stages and the landscape plan being done to submit to Design Review so we can begin that home within approx. 4 months." Pls.' Trial Ex. 53.

In fact, GTP's situation was far different from what the Harts had described it would be in their communications to the Drews prior to their investment. First, contrary to the statements in

15

the PPM, the SA, and the LPA, and the clear implications of Debra's emails to Janette in late June 2004, GTP never raised the $3,600,000 in equity investments necessary to fund the acquisition and development of Shady Glen. Actually, only four partners contributed cash to the Partnership, totaling only $800,000.[5]

During their testimony at trial, Debra and Toby each tried to argue that the Partnership was "fully funded" or "fully subscribed." However, Toby's stated theory as to how the Partnership was "fully funded" on the date that the Drews invested, or later, changed markedly from time to time during the course of this litigation. During his deposition, which was introduced as rebuttal evidence at trial, Toby appeared to admit that the original offering had not been fully subscribed ("I had told them."). Clyde Eugene Hart Dep. 145:3, Nov. 29, 2011. During the same deposition, Toby also testified that he had received a promissory note in the amount of $1,100,000 from the McKnights interest in GTP. Clyde Eugene Hart Dep. 108:24-109:12, Nov. 29, 2011.

At trial, after having conceded that the promissory note to which he was referring in his deposition was the McKnight Note, which was a note from the Harts payable to the McKnights, as opposed to a note from the McKnights to GTP, Toby asserted that he had been confused at his deposition, and that the note that he was referring to as the McKnights' investment was actually a different note, of which he had no copy. Pls.' Trial Ex. 19. Later during the same testimony, Toby testified that he had received "letters of intent" from the McKnights, as well as from an entity named "Balfour, Inc.," owned by Mendelson, and others, and that "since a letter of intent was the same thing as a letter of credit [sic]," and was readily enforceable, he "counted" those documents as if they were cash investments in GTP. Trial Tr., 133:24-25, 134:1-7, Aug. 6, 2013. Unfortunately, Toby was unable to produce copies of these letters of intent, or any other note from McKnight, or even Mr. McKnight's signed LPA. Toby testified that when he learned in late 2004 that Donn McKnight had terminal cancer, and wanted to withdraw from the

---

[5] The following individuals invested cash into GTP: Gary and Janette Drew, $100,000; Ward Glazebrook, $375,000; Robert Fallejo, $150,000; Jay Trygstad, $175,000. Clyde Eugene Hart Dep. 107-08, Nov. 29, 2011.

16

Partnership, he simply "returned" the signed LPA and all evidences of Mr. McKnight's investment, to him, and kept no copies of any of these documents. *See* Trial Tr., 144, Aug. 6, 2013.

Neither NHII as the General Partner of GTP, nor Toby, nor Debra, nor Lance acting on NHII's part, followed any of the requirements set forth in the LPA for the buy-out of a limited partnership interest as Toby testified occurred when he "returned" McKnight's note, or letter of intent, to him, along with the executed LPA. And although Toby also testified, somewhat phlegmatically, that Debra had "bought out" the McKnight interest in GTP in 2004, there is neither any documentation supporting such a transaction, nor is there any evidence that NHII, or anyone, followed any steps set forth in the LPA regarding transfers of partnership interests or the admission of new partners to GTP. Trial Tr., 143-45, 170-71, Aug. 6, 2013.

### 3. Treatment of Shady Glen.

Despite the language of the PPM, the SA and the LPA, and the clear implications of Debra's emails to Janette, in fact, title to the Shady Glen parcels was never transferred to GTP from NHII, nor was the property kept "lien free". Very much to the contrary, NHII, and then Debra, borrowed heavily against the property

NHII acquired Shady Glen from Wolsky by Grant Deed recorded July 2, 2004, and financed the purchase, in part, via an $800,000 loan secured by a first priority lien against the property, just prior to the date of the "closing" of the financing for GTP, which was supposedly sufficient to permit Shady Glen to be acquired and developed "debt free."

On August 16, 2004, Toby on behalf of NHII borrowed $1,000,000 against Shady Glen. The lender, Sequoia, who had also made the July l, 2004 $800,000 loan, was given a Deed of Trust on the entire property which, at that time, had not been split into Lots A and B. Pls.' Trial Ex. 16. This Deed of Trust secured a loan made for the benefit of Toby and Debra that was used to pay-off a loan on their Canada Via residence. Neither of these transactions were disclosed contemporaneously to the Drews.

Thereafter, NHII, acting through Lance and Debra herself (who claimed at the time no

17

longer to have been an officer, director or shareholder of NHII) transferred the property to Debra, again without any contemporaneous disclosure to the Drews.

Lot A was transferred from NHII to Debra through a Vacant Land Purchase Agreement dated July 14, 2006, which is signed by Lance, as an officer of NHII and a Grant Deed, dated September 7, 2006 and recorded September 12, 2006, which is signed by Toby on behalf of NHII. Pls.' Trial Ex. 32, 35. The same day that she received Lot A, September 7, 2006, Debra entered into a $1,837,500 construction loan with WAMU, secured by a Deed of Trust on Lot A.

Lot B of Shady Glen ("Lot B") was transferred by Debra, in her role as secretary for NHII, to Debra personally, by way of the grant deed executed August 1, 2006 and recorded on August 7, 2006. The same day that she received Lot B, August 1, 2006, Debra borrowed $400,000 from Sequoia against Lot B. Debra later borrowed an additional $200,000 from the same lender on October 19, 2006. Pls.' Trial Ex. 54. In February 2008, Debra borrowed a final $750,000 in what appears to be a securitized obligation, held in trust by Westamerica Bank. Pls.' Trial Ex. 85. Westamerica foreclosed on Lot B, which was sold at public auction on March 13, 2009. Pls.' Trial Ex. 124.

Consistent with its rights under its Deed of Trust, WAMU foreclosed on Lot A which was sold at public auction on February 11, 2010. Pls.' Trial Ex. 124.

### 4. The March 2007 Advance.

By March 2007, the Harts were experiencing numerous problems with their construction loan funding from WAMU, and were no longer receiving draws to finance the construction on Lot A. On March 1, 2007, Toby wrote a letter to the Drews (the "March 1 Letter") that informed the Drews of certain problems with the Shady Glen project and requested additional funds to finish construction. Pls.' Trial Ex. 63.

The March 1 Letter begins by stating that although the Partnership had sufficient funds to proceed with the project "within a short time after your investment" various delays in permitting and construction, and the withdrawal of "some investors" because of "medical reasons, death and other commitments," resulted in changed conditions. Pls.' Trial Ex. 63. And, rather than "go out

18

and try to reestablish the limited partnership," Toby had decided to move the Drews investment from Lot A and Lot B just to Lot A. Pls.' Trial Ex. 63. The letter does disclose that "we" (an undefined term in the letter) had taken a construction loan of $1,800,000 against Lot A, and that construction was going to be completed in mid-July 2007. Pls.' Trial Ex. 63. The finished house would be in excess of 6000 square feet, and would have a likely sales price of $3,100,000 - $3,200,000.

The March 1 Letter continues that "we" (again undefined) are currently seeking funds to complete construction of the first house (to occur no later than July), blaming the need for further funds on the fact that the house will be 1,000 square feet larger than the original plan, and on a harsh form of construction loan which "is creating a hardship on the general partners." Pls.' Trial Ex. 63. The letter concludes "I am prepared to establish a return both on the original investment and the additional money at this time and secure all investment money on your part with a due date of August 31, 2007. If there is any interest on your part please contact me as soon as possible." Pls.' Trial Ex. 63.

The Drews testified that they were actually first provided with a copy of the March 1 Letter during a face-to-face meeting with Toby and Debra Hart on March 4, 2007. The Drews also testified that the Harts had not previously told them about any cash flow problems, or that there were any loans on the Shady Glen property; and they testified further that neither Toby nor Debra told them of Debra's acquisition of the property, let alone that she had determined never to build a second house on Lot B. Toby and Debra each testified, once again with no precision (or credibility) that prior to the March 4 meeting, the Drews had somehow become fully aware of the lending against the property, and the fact that Debra, and not GTP, owned Shady Glen. The Harts were unable to state when, exactly, they had made these disclosures.

After consideration, the Drews determined to advance another $100,000 to the Harts. On March 19, 2007, Janette delivered to Lance a cashier's check payable to Toby, in the amount of $100,000. On March 14, 2007, Debra, in her capacity as owner of Shady Glen, executed a Deed of Trust in favor of the Drews. Pls.' Trial Ex. 65. The Deed of Trust was not recorded until

April 17, 2007.  On May 2, 2007, Debra executed a "Straight Note" in the amount of $260,000 in favor of the Drews.  Pls.' Trial Ex. 70.  This note bore no interest, and was all due and payable on or before August 31, 2007.  The parties agree that the $260,000 principal amount of this note was meant to represent the Drews' cash advances of $200,000, plus a "return" of $60,000 to the Drews.

Also on May 2, 2007, in response to an objection from WAMU, the construction lender for the Shady Glen project and first lien-holder on the property, that the terms of their loan agreement with Debra forbade any junior liens on their collateral, the Drews executed a Substitution of Trustee and Deed of Full Reconveyance with respect to the Deed of Trust they had received from Debra.  Pls.' Trial Ex. 68.

The parties disagree as to whether the March 2007 Advance and the consideration provided therefore effected a "buy-out" of the Drews interest in GTP, such that the Drews had only a loan for the amounts advanced, plus the agreed-upon return, or whether the Drews had an investment in GTP of $200,000.  For the reasons set forth below, the Court does not adopt either of the parties' interpretations of this transaction, but finds that the most sensible reading of the legal status of the parties after the March 2007 Advance is that the Drews remained limited partners in GTP as to the July 2004 Investment, but are more appropriately deemed to be lenders to Debra Hart as to the March 2007 Advance.

Needless to say, Debra did not timely pay the May 2nd note.  The Drews and the Harts met again thereafter, and discussed potential ways of satisfying the obligations to the Drews, including payments from sources other than Shady Glen.  These discussions culminated in Janette writing Toby and Debra a letter dated November 2007 that summarized the current status and set forth the Drews' "wish list" with respect to this transaction, including receiving a first priority deed of trust against Lot A, "as was originally proposed." Defs.' Trial Ex. 36.

The Drews and the Harts never agreed on any additional terms and no further documents were entered into by the parties with respect to GTP.   Lot B was foreclosed upon on February 17, 2009; Lot A was foreclosed upon in February 12, 2010.  The Drews and the Harts met

20

thereafter, and Toby told the Drews that Shady Glen had been lost, and that he had no other way of repaying them in cash. He offered to pay them "in kind," via home remodeling, which he could accomplish, or waiving commissions on real estate sales, which was something Debra could accommodate. Pls.' Trial Ex. 123, 124.

The parties held no further meetings thereafter to discuss these issues. In November 2010, counsel for the Drews wrote a letter to the Harts, demanding payment of the $260,000 Note. Thereafter the Drews made additional demands with respect to their rights under California law to review and inspect GTP's books and records, and did, in November 2010, demand arbitration of claims against the Harts.

## II. DISCUSSION[6]

### A.    Debra Hart's Liability to the Drews Under Section 523(a)(2)(A) (Fraud)[7]

Based on these facts, the Drews allege that: (1) Debra and NHII are liable to them for a debt in the amount of $100,000 (plus punitive damages) that is non-dischargeable pursuant to Section 523(a)(2)(A) of the Code, based on Debra's and NHII's fraud and false pretenses involving the Drews' initial investment in GTP, (2) that Lance is liable to them for a debt in the

---

[6] The following discussion constitutes the Court's conclusions of law pursuant to Federal Rule of Bankruptcy Procedure 7052.

[7] There are two points that are not explicitly argued in Defendants' post-trial briefs, but need to be addressed at the outset. First, the fact that neither Debra nor Lance may directly have received nor directly "benefited from" the moneys paid by the Drews to GTP is no defense to a claim under Section 523(a)(2)(A). The Supreme Court has made clear in *Cohen v. De La Cruz,* that one who commits fraud (or to whom another's fraud is appropriately imputed) may be liable, without direct receipt of any "benefit" from the funds provided. *Cohen v. De La Cruz,* 523 U.S. 213, 221 (1998). *See also*, *Ghomeshi v. Sabban (In re Sabban)*, 384 B.R. 1, 6 (B.A.P. 9th Cir. 2008). Second, the fact that the Drews paid money to purchase a partnership interest instead of making a loan is not a bar to liability under Section 523(a)(2)(A) because that section addresses "debts" that may be excepted from discharge, for two reasons: (1) A "debt" is defined in Section 101(12) of the Code as "liability on a claim", and a "claim" is defined at Section 101(5) as "any right to payment." As the parties discussed at trial, if there were fraud in the inducement that caused the Drews to invest in GTP, then the Drews could have, among other things, claimed a right of rescission, which would clearly be a right to payment, and therefor a claim, and therefore, potentially a "debt"; and (2) Based on the unique facts of this case, in which NHII was obliged to refund the investments of the limited partners in GTP if GTP were not fully subscribed, the Court also believes that the equity contributions in the hands of NHII were in the nature of deposits, which clearly creates a debtor/creditor relationship. *See Parker v. Community First Bank, (In re Bakersfield Westar Ambulance, Inc.)*, 123 F.3d 1243, 1246 (finding a debtor-creditor relationship is created when a bank accepts a deposit).

21

amount of $100,000 (plus punitive damages) that is non-dischargeable pursuant to Section 523(a)(2)(A) of the Code, based on the imputation to Lance of Debra's and NHII's fraud and false pretenses involving the Drews' initial investment in GTP, (3) Debra is liable to them for a debt in the amount of $100,000 (plus punitive damages) that is non-dischargeable pursuant to Section 523(a)(2)(A) of the Code, based on Debra's fraud and false pretenses statements and statements and for a debt excepted from fraud.

### 1. The July 2004 Investment.

Section 523(a)(2)(A) of the Code provides, in pertinent part: "A discharge under section 727 . . . of this title does not discharge an individual debtor from any debt – (2) for money, property, services, or an extension, renewal or refinancing of credit, to the extent obtained by– (A) false pretenses, a false representation, or actual fraud, other than a statement respecting the debtor's or an insider's financial condition." 11 U.S.C. § 523(a)(2)(A) (2012).

Numerous cases interpreting the Bankruptcy Code and Congressional policy behind the discharge make clear that the Court must interpret strictly the requirements of those sections of the Code that except debts from discharge in order to promote the policy of preserving the benefits of the discharge for the "honest but unfortunate debtor." *Cohen v. De La Cruz*, 523 U.S. 213, 217 (1998) (quoting Grogan v. Garner, 498 U.S. 279, 287 (1991)).

In order to find a debt non-dischargeable under section 523(a)(2)(A), the Court must find that (1) the debtor made a false statement, (2) that the debtor knew the statement was false when made, (3) that the debtor made the statement in order to induce the plaintiff to advance money or property, (4) that the debtor justifiably relied on the statement in advancing money and (5) that damages proximately resulted thereby. *Ghomeshi v. Sabban (In re Sabban)*, 384 B.R. 1, 5 (B.A.P. 9th Cir. 2008). It is the burden of the party objecting to the dischargeability of debt to prove, by a preponderance of the evidence, that they have satisfied the requirements for non-dischargeability. *Grogan v. Garner*, 498 U.S. 279, 291 (1991).

In determining whether a debtor's conduct and intent satisfy the requirements of Section 523(a)(2)(A), the Court may draw inferences from the debtor's actions, as well as from

22

surrounding circumstances. *See, e.g.*, *Household Credit Servs. v. Ettell (In re Ettell)*, 188 F.3d 1141, 1144 (9th Cir. 1999). In making the required determinations as to Debra's liability on the facts presented here, the Court looks to three sources of statements, each made by Debra: (1) statements contained in GTP documents (the PPM, the SA and the LPA), (2) oral statements made by Debra to the Drews, and (3) other contemporaneous statements made in writing by Debra to the Drews (in cover letters and emails). The Court is convinced that, viewed in the aggregate, and in the most sensible and appropriate context, these statements are false and misleading.

As an initial matter, the Court rejects the assertion of Debra and Toby during their testimony that none of these categories of statements were made by Debra, or should be deemed to have been made by her.

As to the written statements contained in the GTP documents, it is clear from testimony that Debra drafted at least a portion of at least one of these documents (the PPM), and must have reviewed the remainder of that document. Beyond that, as an officer and director of NHII, the General Partner of GTP, Debra cannot credibly claim a blanket ignorance of the contents of the substantive, operative documents that set forth NHII's obligations to GTP, and that provided the basis for potential limited partner's decisions to invest. *See, e.g.*, *Sherwin Williams Co. v. Grasso (In re Grasso)*, 497 B.R. 434, 442-43 (Bankr. E.D. Pa. 2013) (finding the debtor to be an "insider" of the general partnership through analysis of 11 U.S.C. § 101(31); therefore, statements in partnership documents were attributable to the debtor). Moreover, as the person who delivered these documents to the Drews for their use in evaluating the investment opportunity, Debra is charged with the truth or falsity of their contents. *See, e.g.*, *Moorad v. Moorad (In re Moorad)*, 132 B.R. 58, 62 (Bankr. N.D. Okla. 1991) ("By causing the [private placement memorandum] to be prepared and circulating it with the intent others rely on it in making investment decisions, [debtor] became responsible for the veracity of its contents."). To the extent that Debra and Toby stated that Debra did not deliver these documents to the Drews prior to or at the meeting at Canada Via, the Court finds that testimony, like much of Debra and

23

Toby's testimony, not at all credible.

As to the oral statements allegedly made by Debra, as stated prior, the Court simply finds the Drews' consistent and forceful testimony about Debra's statements believable, and Debra's generic denial and imprecise recollections about specific instances not credible, in the least.

As to the written statements in letters and emails, Debra and Toby each testified that Toby would have been responsible for the contents of those messages, but that since he was not computer-literate, he would have dictated his message to Debra. Debra and Toby thus argue that Debra was merely a scrivener and not responsible for the contents of emails or letters. The Court also rejects this argument. First, as a factual matter, there is absolutely nothing in any of these communications to indicate that Debra was not the author of the messages, nor any indication that she was writing on Toby's behalf, or at his direction. Any such qualification could easily have been made at the time; that it wasn't, among other factors, makes Debra's later attempts to disavow the statements not credible. And as a matter of law, Debra's communications, in her capacity as an officer of NHII, the general partner of GTP, with a potential investor, have a legal consequence simply by virtue of her legal capacity, and her apparent authority, to speak on behalf of, and bind, her corporation. *See National Farm Financial Corp. v. PSM Holding Corp. (In re National Farm Financial Corporation)*, 07-3134 TC, 2008 WL 183595 at *2 (Bankr. N.D. Cal. 2008) (finding under section 208 of the California Corporations Code, the apparent authority of an officer binds the corporation). Whether she actually exercised authority, or merely appeared to, by virtue of her "taking dictation" is irrelevant under the circumstances.

*Statements in the GTP documents*. The PPM, authored by Debra, and the SA, delivered to the Drews by Debra, each stated that GTP would raise $3,600,000 in equity contributions from investors. It did not, and, as set forth below, the Harts knew it would not be raised in the manner implied to the Drews. The PPM and the SA each stated that if GTP did not raise $3,600,000 in equity contributions, the equity contributions that had been raised would be refunded. Didn't happen, and the circumstances strongly suggest that the Harts had no intention of honoring this obligation, at any time.

24

*Oral statements by Debra*.  The Drews testified, credibly, that in addition to the statements contained in the PPM, Debra, while at the site visit, and later Debra and Toby, while at their home, each stated, orally, that the Shady Glen project would be financed solely via partnership equity contributions, and not through debt of any kind.  Accordingly, per Debra and Toby, this project would have none of the risk inherent in most real estate projects (i.e., that the carrying costs of debt financing on the project might result in the project's failure, through foreclosure), and this project was uniquely risk free.  That such statements concerning the risk-free nature of the project would have been material to a banker, like Janette Drew, goes without saying.

*Statements in letters and emails written by Debra*.  On June 23, Debra wrote to the Drews telling them that "We need your response to this by Wednesday, June 23rd . . . .  All monies must be deposited by June 28th for a close of escrow on the land July 1, 2004."  Six days later, and still before the Drews had decided to invest in GTP, Debra wrote:  "The lots record Friday a.m.7/2 [sic] i.e. they will no longer be in escrow as stated in the Private Placement Memorandum, which is why we extended the offering from 6/30 to 7/2 at close of business as all funds will be deposited in the Shady Glen account and the land is ours!"  The very next day, and still before the Drews had written a check to GTP, Debra wrote to the Drews that, having checked with "the Atty" [sic], she confirmed that the funds from the proposed limited partners needed to be certified, and GTP needed to have all of the Drews' investment funds deposited prior to the closing, "as it would put the Limited Partners and the project at risk if for some reason when the time to put up more funds came and you were unable to for any reason it then risks them as well as holds up the project."  In the same email, Debra goes on to say "We (New Horizon Investments, Inc.) [sic] are paying the balance of the original land loan off tomorrow, so we need the signed subscriptions & funds signed and in by Tues - July 6 to proceed as a Partnership instead of New Horizon."

There is simply no way to conclude from these statements, taken in their entirety and in context, anything other than that the following message was delivered, "We are closing this

25

offering now, and we have therefore done what we need to do to raise the funds necessary to accomplish the purposes of the partnership. The Partnership will be acquiring the property presently, and we are ready to go. Act now, or miss out on this opportunity."

The impression that these statements created was not true. GTP had not raised $3,600,000 as of a July 2004 "closing" of the offering. GTP had not, and was not about to, acquire Shady Glen. And far from refunding the limited partners' funds if GTP's offering were not fully subscribed, the Harts cannot even account for where the $800,000 that was raised was spent.

And Toby and Debra clearly knew that these statements were not true, by their concurrent obfuscation and failure to respond to Janette's inquires. Ironically, the Court can also gauge the Harts' awareness of the falsity of the statements they made and the impressions that they created by their repeated, but relentlessly incredible, attempts at trial to rationalize their conduct.

For example, Toby and Debra spent much of their testimony at trial arguing that the GTP offering was actually fully subscribed. But their explanations of how that could be so varied significantly throughout their testimony. As stated previously, Toby changed his story on this subject from "I did tell them" (that the offering was under-subscribed) to "I really had the money" (in notes I can't produce and that don't provide the required capital in any event) to "I had letters of intent."

Briefly stated, Toby and Debra never provided any explanation, credible or incredible, that the GTP partnership offering had been "fully subscribed."

And at trial Debra and Toby changed their story yet again, to state that GTP had enough funding money at the "closing" of the offering, or soon thereafter, to begin the work of the project. Presumably, other funds were to be raised over time, as needed. Toby and Debra argued therefore that since the LPA didn't have deadline for raising the $3,600,000, they had no obligation to raise it all right away, but could do so within an undefined reasonable time.[8] Toby

---

[8] In fact, the Harts appear to have worked very hard to convey a very different impression, i.e., that all the money had been raised, and that GTP was buying the property.

26

and Debra attempted to bolster this argument by claiming that, in fact, the Drews were the very first investors, and that the Drews were aware of that fact, and therefore knew or should have known that it was impossible for GTP to have all funds necessary to do the project when the Drews invested. The Drews denied having any such knowledge at the time they invested, and there is no evidence that such a fact was communicated to them.

The Harts' explanation is clearly after-the-fact nonsense. First, the whole point of the statements that $3,600,000 would be raised in equity only was to highlight the risk-free nature of the investment – with only equity, there would be no risk of adverse actions by a bank, or a foreclosure. It was exactly these risks from debt-based financing that the Drews were trying to avoid. Having investors' money placed into the partnership and then used for partial performance of a land purchase agreement, without assurance the rest of the funds would be there from the outset, created exactly the risk the PPM said would never materialize.

For all of the foregoing reasons, it is also readily apparent that Debra and Toby each knew that their statements were false and misleading.

Likewise, there is no serious doubt but that these statements, read in their entirety, were made with intent to deceive the Drews into thinking that the partnership was "fully funded" and that their investment would therefore have the protections set forth in the PPM, the SA and the LPA, and as touted by Debra and Toby's oral statements.

This factor is made especially clear in light of the email that Janette wrote to Debra on July 6, 2004, mere days after the "closing" of the offering on the partnership: "Hi Debra - how is the project going? Did title transfer ok to the partnership?," and did not receive any reply.[9]

The Court also concludes that the Drews justifiably relied on Toby and Debra's

---

[9] Further intent to deceive may be inferred from the fact that NHII did not merely hold the property longer than it was implied it would, it liened it up. Strictly speaking, there was no prohibition on property of NHII being liened up–but there would have been no need to do so if all funds for GTP had been raised by equity contributions, as the documents stated. And a lien on Shady Glen, even in NHII's hands, created a risk that the property wouldn't be transferred to GTP (based on a foreclosure against NHII's interests, enforcement of a due on sale clause in a deed of trust, etc.) that was directly *contra* the general provision in the LPA against NHII doing anything to make the goals of the Partnership not obtainable. At a minimum, these actions created risk that should have been disclosed immediately to the limited partners, and wasn't.

27

statements. Justifiable reliance is a relatively low standard, which looks not to an objective standard of "reasonableness" but rather to the particular circumstances on which plaintiff decided to advance funds. *Field v. Mans*, 516 U.S. 59, 77 (1995). There is no reason to conclude that the Drews reliance on Debra's statements was not justifiable. Debra had touted herself, in the documents provided to potential investors, as well as in her oral statements, as a sophisticated real estate professional, who, assisted by the "NHII team" of Toby and Lance, had a proven track record of excellent results in real estate projects in the area. There was no reason for the Drews to doubt these statements, or the bona fides of the Harts.

And clearly, the Drews were damaged by the fraud of Debra and Toby Hart. It is important to focus on the nature and consequence of the fraud committed against the Drews in order correctly to assess the damages incurred. The fraud in this instance was the inducement of the Drews to make contributions to GTP under false pretenses, i.e., that their investment would be protected and was essentially risk-free. The harm occurred when those funds were made available for use without the ability fully to realize the goals of the partnership. That harm flowed directly from the false statements about GTP's financing. In the meantime, the investors' money is clearly gone, no one seems to know exactly where, but the Shady Glen property has been neither acquired nor developed.

The Court therefore concludes that the Drews have demonstrated that Debra Hart committed fraud as set forth in Section 523(a)(2)(A) of the Code in connection with their investment of $100,000 into GTP in July 2004.

### 2. The March 2007 Advance.

Based upon the representations contained in the March 1 Letter, and their subsequent conversations with Debra and Toby, the Drews advanced another $100,000 to the Harts on March 19, 2007.

The Drews claim that this advance was a further investment in GTP. Toby and Debra claim it was a loan to Debra and that because the Drews received a promissory note from Debra for $260,000, which the parties agree was intended to represent the first $100,000 invested in

28

GTP, the second $100,000 advanced in March 2007, and a projected "return on investment" of $60,000, delivery and acceptance of the note constituted either an extinguishment of the Drews' interest in GTP, or a buyout by Debra of their interest.

The Drews claim that the March 2007 Advance was a further equity investment into GTP, based upon some admittedly ambiguous language in the March 1 Letter ("I am prepared to secure your **entire investment**") (emphasis added). The Drews argue that there was nothing inappropriate in Debra offering to "secure" their continued investment in GTP with a promissory note and a deed of trust from her. Although they conceded that they could not have received a recovery from both the promissory note as well as from GTP on account of their equity interest, in their minds, these alternative modes of payment were not mutually exclusive. They could have recovered from either source – but not both.

Toby and Debra claim that a buyout of the Drews partnership interest was referenced in the letter ("which will conclude the partnership"), and that no other conclusion can follow in light of the incompatibility of a limited partner simultaneously holding both a partnership interest in a limited partnership and a promissory note for the same economic interest. To this point, Debra and Toby refer to language in the LPA that states that a limited may only receive property from GTP via a distribution to the partners. Pls.' Trial Ex. 11, at 8. Because a promissory note and any interest to be paid thereby are means of payment on account of an interest in GTP other than an equity distribution from the partnership, the Harts claim that the Drews' acceptance of a promissory note not only rendered the second $100,000 advance a loan, but extinguished the Drews' initial partnership interest.

The Court is convinced that the correct answer lies between these extremes. As an initial matter, the Court is not persuaded by either parties' reliance on the language of the March 1 Letter – the language is simply too imprecise and ambiguous to provide a reliable basis for characterizing what the Harts were seeking as either a loan or an equity investment. In fact, based on the chronology set forth at trial, it appears that as of March 2007, the Harts' construction draws from WAMU had stopped, and they were desperate to find alternative sources

29

of funding to complete construction of Debra's house on Lot A. Under these circumstances, it is likely they would have said or offered anything to obtain additional funds.

The Court agrees with the Harts however that the second $100,000 is most appropriately deemed a loan and not a purchase of a partnership interest. First, the consideration for the additional $100,000 is a promissory note, from Debra, which Debra attempted to secure via a deed of trust against Shady Glen. And the $100,000 that the Drews contributed were paid to Toby, for use by Two Harts, Inc., not to GTP. Thus, the partnership (GTP) neither received any funding from the Drews in March 2007, nor gave any consideration therefore. Second, the Drews did not sign a new subscription agreement, nor receive anything from the Partnership evidencing a further investment, both requirements of the LPA. Pls.' Trial Ex. 11, at 2, 30. Thus, there is no persuasive argument that the additional $100,000 was a purchase of additional interests in the partnership or receipt of consideration from a third party.

However, there is also nothing in the documentation that compels the further result urged by the Harts, i.e., that receipt of the promissory note bought out or extinguished the Drews' existing partnership interest. First, there is no document that purports to transfer the Drews' interest to Debra, or to extinguish or redeem that interest by GTP, or NHII. Neither the promissory note itself, nor the March 1 Letter, which is from Toby but appears to have been written on behalf of NHII, contain any language that would effect a sale of a partnership interest. Nor is there any document from GTP or its General Partner NHII that appears to extinguish or redeem the interest. Second, although the LPA contains specific provisions governing the sale of partnership interests or the withdrawal of a limited, none of the required steps were taken. Pls.' Trial Ex. 11, at 18-20. Third, although it is correct that a limited partner's receipt of a promissory note with interest from a third party is inconsistent with an equity interest in the same partnership, there is nothing in the LPA that prohibits the consideration that a limited may receive from a third party (i.e., not the partnership), and there is nothing in the LPA or partnership law generally that would automatically vitiate an interest in a partnership.

The Court concludes therefore that the March 2007 Advance was a loan, and the Court

30

must determine whether this debt is non-dischargeable under section 523(a)(2)(A).

Were false statements made in connection with the request for additional funding in March 2007?  Clearly, the March 1 Letter contained statements that were untrue and deceptive about the initial funding for GTP, and failed to disclose material information, i.e., that Debra, not GTP, owned the Shady Glen property.  A failure to disclose a material fact when one is under a duty to do so can constitute fraud.  *See Barnes v. Belice (In re Belice)*, 461 B.R. 564, 580 (B.A.P. 9th Cir. 2011); *Citibank (S.D.), N.A. v. Eashai (In re Eashai)*, 87 F.3d 1082, 1089 (9th Cir. 1996).

 The letter also included statements concerning the expected sales price for the house on Lot A, and the resulting return for anyone providing additional funds.  Although these statements proved incorrect, and they were apparently based on overly-optimistic projections, the Court believes that the statements about return/profit and when the house could be sold are best characterized as "forward looking" and not strictly speaking factual.  However, the Drews' testimony was also quite clear that Debra and Toby each stated during their March 4 meeting that (1) everything is "fine" except for small problems getting draws from the lender – and failed to disclose repeated disputes with WAMU concerning draws on the construction loan as well as prior correspondence with WAMU in which Debra threatened a lawsuit; (2) that all they needed to complete construction on Lot A was another $100,000 from the Drews – and failed to disclose that they had also solicited (and obtained) additional funding from the Glazebrooks in amounts well in excess of the amounts sought from the Drews; (3) that with the infusion of the additional funds from the Drews construction on Lot A would be finished by July – notwithstanding the fact that they had no reasonable belief that the construction could be completed by then (in fact, it was never fully completed); and (e) that the additional funding would be used exclusively to complete construction on Lot A, as soon as possible, to maximize the likelihood that the projections regarding sale of that property and realization of a return on that sale might be met – notwithstanding the fact that the Drews' second $100,000, which was made payable to Toby, was not deposited into the Two Harts, Inc. checking account.  Thus, although the parties agree that

31

the sole purpose of the March 2007 Advance was to fund completion of Lot A, there is no evidence that this money was used for that purpose.

Were Toby and Debra aware of the falsity of these statements? Clearly, they were. As an initial matter, the Court once again finds the testimony of the Drews, that they had no idea in March 2007, and Debra and Toby had certainly never told them, that GTP had failed to raise the $3,600,000 in initial funding, or that Debra, not GTP, was the owner of Shady Glen, entirely credible, and the testimony of Debra and Toby, that they had informed the Drews of these facts via some email(s) that had later been lost, or through some conversation they know they must have had, but can't remember when, thoroughly lacking in credibility. Debra and Toby knew that their statements about the initial capital for GTP were untrue and misleading. They also had to know that their failure to disclose the true ownership of Shady Glen was, in the context of their further solicitation, highly material, and misleading. Their failure to make these necessary disclosures was clearly done to sugarcoat the other bad news and make it less likely the Drews would investigate. It was inconceivable that the Harts did not know that these failures to make accurate disclosures, and the affirmative statements they made at the March 4 meeting, were false and misleading.

Under these circumstances, there is also no question but that these statements were made to induce the Drews to advance additional funds, while lessening the likelihood that they would also ask difficult questions.

Did the Drews justifiably rely on these statements? The Court concludes that they did, at the time of the additional funding (March 2007), in light of the continuing fiduciary relationship between the Drews and the Harts, and because there is nothing on these facts to suggest a basis for the Drews to have been on inquiry notice of any problems.

Were the Drews damaged by Debra and Toby's fraud? Clearly they were. The use of the Drews additional $100,000 for purposes other than the completion of Lot A constitutes immediate harm and damage to the Drews. It is equally clear that the Drews, had they known the complete truth about GTP and the ownership of Shady Glen, would never have advanced any

Case: 11-04175   Doc# 187   Filed: 03/14/14   Entered: 03/14/14 16:49:05   Page 32 of 55

funds to Toby Hart, or Two Harts.

The Court has little difficulty concluding that the Drews have met their burden to establish the elements of a cause of action under Section 523(a)(2)(A) with respect to the March 2007 Advance.

**B.      The Drews' Claims under Section 523(a)(2)(A) are Barred by the Applicable Statute of Limitations**

Debra, and Lance, to the extent that his liability under Section 523(a)(a)(2)(A) is derivative of hers, have raised the applicable statute of limitations as a defense to any action against them based on fraud.  For the reasons set forth below, the Court concludes that the statute of limitations does bar any such action by the Drews.

The essence of a claim under Section 523(a)(2)(A) is that the debtor defrauded the plaintiff.  *Cohen v. De La Cruz*, 523 U.S. 213, 218-17 (1998).  Accordingly, for any claim under Section 523(a)(2)(A) based upon a pre-bankruptcy filing claim for fraud,  the statute of limitations for such an action under applicable state law can provide a defense, if the plaintiff failed to commence an action within the time period set forth in such state law.  Put another way, in order successfully to allege a claim for non-dischargeability for debt under Section 523(a)(2)(A), the plaintiff must have, as of the commencement of the case, a viable claim for fraud under state law.  *See Lee-Benner by & Through Mills v. Gergely (In re Gergely)*, 110 F.3d 1448, 1453 (9th Cir. 1997); *Saccheri v. St. Lawrence Valley Dairy (In re Saccheri)*, No. 09-1273, 2012 WL 5359512 at *9 n. 13 (B.A.P. 9th Cir. 2012).

Section 338(d) of the California Code of Civil Procedure ("Cal. CCP") provides that the statute of limitations in California for the commencement of an action based on fraud is three years.  Cal.Civ.Proc.Code § 338(d) (2014).  Actions brought after the expiration of three years after the accrual of the action are barred.  However, recognizing that the essence of the wrongful conduct in fraud cases is allegedly deceptive or misleading conduct by the defendant, Section 338(d) of the Cal. CCP further provides that an action is not deemed to have accrued "until the discovery, by the aggrieved party, of the facts constituting the fraud."  *Id.*

33

The Drews did not commence an action against Debra Hart prior to her bankruptcy filing on March 4, 2011. Thus, if the fraud action against Debra "accrued" prior to March 5, 2008, it is barred.

The Drews present two arguments as to why their fraud action did not accrue prior to March 5, 2008: (1) that their action did not accrue until they suffered damages from Debra's fraud, and that did not occur until the bank foreclosure on Lot A (the latter of the foreclosures against the two parcels that comprised the Shady Glen property) made it impossible for them to be paid, as originally promised, from the proceeds of a disposition of Shady Glen, and (2) they did not "discover" Debra's fraud until sometime after March 5, 2008. The Court finds neither argument convincing.

The Court does not agree that the Drews' fraud action against Debra did not accrue until completion of the foreclosures on Shady Glen. The Court agrees with the proposition that a cause of action has not fully accrued until the occurrence of each element thereof, including damages. *Norgart v. Upjohn Co.*, 21 Cal. 4th 383, 397 (Cal. 1999). However, as the Court made clear during the discussion of the elements of the Drews actions under Section 523(a)(2)(A), with respect both to the investment of $100,000 in GTP in July 2004, and the loan of $100,000 in March of 2007, the Drews were damaged when the money was advanced under false pretenses, and not used, in either case, in the manner that Debra Hart had promised it would be used. *See, e.g.*, *id*.

Certainly, there is no credible argument that the Drews did not incur damages until the foreclosure on Shady Glen was complete. This is because neither the Drews nor GTP had any interest in Shady Glen of which they were deprived via the foreclosure.

As will be discussed in greater depth below, although Shady Glen was supposed to have been transferred into GTP for development, that never happened. Nor does it appear that GTP acquired, from the mere expectance of a transfer, any cognizable legal rights in Shady Glen from which the Drews might base some entitlement rights that were cut-off by the foreclosure. Although the LPA provided for transfer of Shady Glen to GTP via a Land Purchase Agreement,

34

and Toby made vague references to having drafted such a document, no copy of that document was ever produced. We are thus left in the dark as to whether there was a form of Land Purchase Agreement, and what rights might have been conveyed to GTP thereunder. It is a certainty, however, that title to Shady Glen never passed to GTP. Nor has any party asserted that GTP, let alone the Drews, had any interest such as an equitable lien on Shady Glen, the existence of which would have depended on proof of transfers from GTP to NHII, tracing of funds, etc., none of which were made at trial. *See Bilyeu v. Morgan Stanley Long Term Disability Plan,* 683 F.3d 1083, 1096 (9th Cir. 2012) (discussing the tracing requirement for equitable liens). There is thus no credible argument that GTP, or the Drews, had an interest in Shady Glen sufficient to demark the date of "damages" for Debra Hart's fraud as the date of foreclosure. *See Platt Elec. Supply, Inc. v. EOFF Elec., Inc.,* 522 F.3d 1049, 1054 (9th Cir. 2008); *Leal v Computershare*, 2010 WL 4038609 at *6 (D. Nev. Sept. 28, 2010).

Nor is there any basis to conclude that the Drews were not on at least inquiry notice of Debra Hart's fraud prior to March 5, 2008. Cases interpreting Cal. CCP Section 338(d) state consistently that a party is on inquiry notice of facts sufficient to give notice of a cause of action for fraud when one becomes aware of a fact the existence of which would cause a reasonable person to investigate and discover a fraud. *Norgart*, 21 Cal. 4th at 397-99. And although a victim of a fraud perpetrated by one who is a fiduciary may not be on the same type of inquiry notice as a party in an arm's-length relationship to the alleged fraudster, there is no indication in the case law that even a party in a fiduciary relationship may ignore obvious and unambiguous "red flags" that things are not as they have been represented. *See Graham-Sult v. Clainos*, 738 F.3d 1131, 1149-50 (9th Cir. 2013); *Betz v. Trainer Wortham & Co.*, 236 Fed. Appx. 253, 254 (9th Cir. 2007) (applying delayed discovery rule to breach of fiduciary duty claim brought under section 343); *see also, Alfaro v. Community Housing Improvement System & Planning Assn., Inc.*, 171 Cal. App. 4th 1356, 1394 (2009) (finding grant deed which disclosed deed restriction with express reference to recorded document gave plaintiff's actual knowledge of deed restriction and inquiry notice of the nature of that restriction).

35

In evaluating the facts from which notice of the fraud might have been given, the Court notes, again, that the Drews and the Harts have markedly different "stories" and recollections. The Harts claim that they had told the Drews about the failure to raise $3,600,000 in equity for GTP, the bank debt against Shady Glen, and the fact that Debra, not GTP, was the owner of that property orally, or via email, well before the March 1 Letter from Toby/NHII. The Harts could not, however, produce any evidence of any written communications with the Drews on these subjects prior to March 2007; nor were they able to say when, precisely, they had discussed these matters with the Drews orally. And the Drews consistently and vehemently denied that the Drews told them any of these facts prior to March 2007. Viewing the character of the testimony, as well as the credibility of the witnesses, the Court believes the Drews' assertions. The Court also finds the Drews' assertions more credible in light of the email correspondence between the Drews and Debra Hart in September 2006, after she had acquired Shady Glen, in which Debra discussed progress on the project, yet completely failed to disclose, or acknowledge, her ownership of the property.

Nor is the Court inclined to agree with the Harts that their March 1 Letter made full disclosure with respect to any prior misstatements or misleading statements or failures to make disclosure. Viewed in context, the March 1 Letter is a model of misdirection, and thoroughly fails to "come clean" about the ownership of the property, or the true status of the project. The Court is thus convinced that far from alerting the Drews of a past fraud, the March 1 Letter was carefully crafted to avoid making accurate disclosures and to deflect the Drews' attention from the facts and circumstances that might have led them to discover the truth about GTP and Shady Glen. *See* Trial Tr., 96:3, 7, et. seq., Apr. 2, 2013; *see also*, Pls.' Trial Ex. 63.

The Harts also point out, however, that one result of their discussions with the Drews on March 4, 2007 that led to the Drews advancing another $100,000 was that the Drews received a deed of trust on Lot A of Shady Glen, dated March 14, 2007, with a conspicuous notation that Debra Hart, not GTP, was the owner of the property pledged as security. Pls.' Trial Ex. 65. The Drews claim that they had been promised a deed of trust on Canada Via, the Harts' home, and

that they simply didn't notice that the deed of trust they received covered Shady Glen; accordingly, the fact that Debra appeared as the owner of the property pledged did not register anything awry, since they knew that Debra owned Canada Via. The Court finds this testimony at least plausible, and is thus not inclined to rule that the Drews had inquiry notice of any suspect facts prior to May 2, 2007.

However, as also discussed above, WAMU, the construction lender on the Shady Glen project, was not willing to tolerate the existence of a junior lien creditor on their real property security, and they demanded that Debra "fix" the problem by removing the deed of trust in favor of the Drews.[10] This was accomplished by a deed of reconveyance of the deed of trust against Lot A, which was signed by the Drews on May 3, 2007 and recorded on May 4, 2007.

Although the Drews claimed to be still at best "confused" by the deed of reconveyance, that explanation is neither plausible, nor legally sufficient to avoid the conclusion that as of May 3, 2007, the Drews were on notice of the fact that Debra Hart, and not GTP, was the owner of Shady Glen.

One might plausibly claim that one had simply not reviewed a form of deed of trust that was sent in the mail, and might not have noticed that the deed of trust referred to security that was different from what one believes one had been promised, and that revealed that the property was owned by a third party. One may not plausibly claim, however, that one failed to read or understand the contents of a deed of reconveyance that one signed, and that unambiguously identified the property being released from a lien, and the owner of that property. No matter what one believes about the testimony of the parties, or their prior discussions, or lost emails, or deeds of trust that were filed without review, one simply cannot believe that a party as sophisticated as Janette Drew, a banker, could have signed a deed of reconveyance and not be charged with knowledge of its contents.

Having been apprised that Debra, not GTP, was the true owner of Shady Glen, the Court

---

[10] In fact, the Glazebrooks had also received a deed of trust for their further advances of cash, which was also required to be removed via a deed of reconveyance.

cannot help but conclude that the Drews, armed with that knowledge, were also from that time forward on inquiry notice of all of the facts which their reasonable inquiry would have revealed; these facts included the Harts' failure to capitalize GTP as promised, the failure timely to refund the Drews' money when the partnership was irrevocably under-subscribed, and the failure to transfer Shady Glen to GTP. Thus, the Court concludes that the Drews' cause of action for fraud against Debra Hart based upon their initial $100,000 investment accrued, and the statute of limitations began to run, no later than May 3, 2007.

Although the Court acknowledges that the Drews made their March 2007 Advance based on different misrepresentations, the Court concludes that the same result pertains as to that transaction. The misrepresentations that the Harts made in March 2007 – (1) we only need an additional $100,000 from you to finish Lot A, (2) the project is otherwise going great, (3) we will be done with Lot A by July, (4) we will use all of the funds you give us to finish Lot A – were more immediate in their scope. And armed with the knowledge of Debra's prior misstatements as revealed by the deed of reconveyance, and in light of the Harts' failure to complete Lot A or make any payments on the $260,000 promissory note by August 2007, as promised, the Court believes that a reasonable, prudent lender would have inquired, and would have discovered, that the Harts had also borrowed funds from the Glazebrooks (who had also received a deed of trust against Shady Glen that was discoverable via a title search), that WAMU and Debra had been at odds about the Shady Glen project for months (including with respect to WAMU's annoyance at the filing of a junior lien against their security), that the project was nowhere near completed, and that the Harts could not account for the disposition of the $100,000 received from the Drews in March 2007. In short, the Court also concludes that the revelations of May 3, 2007 would also have led to the discovery of the Harts further lies in March 2007, such that the statute of limitations also bars an action for fraud to recover the March 2007 Advance.

38

### C. The 523(a)(2)(A) claim against Lance

The Drews concede that Lance neither made a statement to them nor undertook any conduct that would support a claim under Section 523(a)(2)(A). However, they urge the Court to impute to Lance Debra's fraud against them under the principles set forth in the cases *Strang v. Bradner*, 114 U.S. 555 (1855), and *Tsurukawa v. Nikon Precision, Inc. (In re Tsurukawa)*, 287 B.R. 515 (B.A.P. 9th Cir. 2002). These cases stand for the proposition that in circumstances in which the debtor stands in a principal/agent relationship with a third party who commits fraud (because, for example, the parties are partners, or deemed to be partners, in a business enterprise) and the debtor participates in some material fashion in the fraudulent activity, the non-debtor party's fraud should be imputed to the debtor.

As will be discussed at greater length in this Court's Memorandum of Decision with respect to *Karaeff v. Hart*, courts must be very wary of imputing fraud under Section 523(a)(2)(A) to a debtor based upon a third party's conduct. *See* Karaeff Mem. Part III Section A. But those issues need not deter us here. Rather, since Lance's liability under Section 523(a)(2)(A) is based solely on the fraud of Debra, Toby and NHII, and since, as stated earlier, the statute of limitations for actions under fraud provides a complete defense to any such liability based on Toby's, Debra's and NHII's actions, that statute also provides a complete defense against any liability that might be imputed to Lance.

Therefore, Lance can have no liability to the Drews under Section 523(a)(2)(A).

### D. The 523(a)(4) claim against Debra Hart – Defalcation By a Fiduciary

Section 523(a)(4) excepts from discharge any debt for "fraud or defalcation while acting in a fiduciary capacity, embezzlement, or larceny." 11 U.S.C. § 523(a)(4) (2012).

The Drews' First Amended Complaint seeks a determination that Debra, Lance and NHII are each liable under Section 523(a)(4) both for defalcation while acting in a fiduciary capacity, and for embezzlement, with respect to both the July 2004 Investment and the March 2007 Advance.

39

**1.  The Claims for Defalcation While Acting As a Fiduciary**

A claim is non-dischargeable under Section 523(a)(4) based on defalcation by one acting in a fiduciary capacity where "(1) an express trust existed, (2) the debt was caused by fraud or defalcation, and (3) the debtor acted as a fiduciary to the creditor at the time the debt was created." *Niles v. Niles (In re Niles)*, 106 F.3d 1456, 1459 (9th Cir. 1997) (quoting *Klingman v. Levinson*, 831 F.2d 1292, 1295 (7th Cir.1987)).  "The meaning of 'fiduciary' in Section 523(a)(4) is an issue of federal law." *Ragsdale v. Haller*, 780 F.2d 794, 796 (9th Cir. 1986) (citing *Davis v. Aetna Acceptance Co.*, 293 U.S. 328, 333 (1934)).  The broad general definition of fiduciary – a relationship involving trust and confidence, is not applicable in the dischargeability context. *Ragsdale,* 780 F.2d at 796.  The trust giving rise to a fiduciary relationship must be imposed prior to any wrongdoing; the debtor must have been the trustee before the wrong, and without reference to it.  *Id*.  *See also*, *Double Bogey, L.P. v. Enea (In re Enea)*, No. 12-01877, 2013 WL 1209479, at *3-5 (N.D. Cal. Mar. 25, 2013).  Therefore, trusts arising *ex maleficio*, i.e., those that arise by operation of law upon a wrongful act (e.g., constructive, resulting, or implied trusts), are not relevant for Section 523(a)(4)'s purposes.  *Blyler v. Hemmeter (In re Hemmeter)*, 242 F.3d 1186, 1189-90 (9th Cir. 2001); *Runnion v. Pedrazzini (In re Pedrazzini)*, 644 F.2d 756, 759 (9th Cir.1981).

Courts look to state law to determine if an express trust was created.  *See Ragsdale,* 780 F.2d at 796-97; *In re Baird*, 114 B.R. 198, 202 (B.A.P. 9th Cir. 1990).  The statute (or agreement) creating the trust must "define the trust res, spell out the trustee fiduciary's duties and impose a trust prior to and without reference to the wrong which created the debt." *Baird* 114 B.R. at 202.  And in order for there to be a trust "res" there must be property that is entrusted to the debtor-fiduciary.  *See Cal-Micro v. Cantrell (In re Cantrell)*, 329 F.3d 1119, 1125-27 (9th Cir. 2003), *Evans v. Pollard (In re Evans)*, 161 B.R. 474, 477-78 (B.A.P. 9th Cir. 2001).

Was an express trust created here?  Although the LPA did not explicitly speak in terms of an "express trust," or define NHII, its general partner, as a trustee of a fiduciary, governing case-law has long held that, in the case of partnerships, such trust duties arise automatically under

Case: 11-04175   Doc# 187   Filed: 03/14/14   Entered: 03/14/14 16:49:05   Page 40 of 55

California law. *Rasgdale,* 780 F.2d at 796-97. Thus, under California law, each partner in a partnership is a trustee over the assets of the partnership, and such relationship is a sufficient basis for liability under Section 523(a)(4).

Clearly therefore, NHII, as the general partner in GTP, is in a trust relationship with the Drews as limited partners, and owed the Drews the sort of duties that could implicate liability under Section 523(a)(4).

If there was a sufficient trust relationship created here, was there a trust res? The Court concludes that there was a trust res in GTP, but it was not the asset that the parties spent most of their time arguing about at trial and thereafter, i.e., the Shady Glen property. To the contrary, the Shady Glen property never became an asset of GTP, title was never transferred to GTP via grant deed.[11] And since GTP never owned Shady Glen, it was never part of the trust "res" of the partnership. *See, e.g.*, *Enea,* 2013 WL 1209479 at *4-5; *Evans*, 161 B.R. at 477-78.

The Drews argued that because the Shady Glen property was supposed to have been transferred to GTP, it constituted "de facto" partnership property. The Drews did not cite any authority for this proposition under state or federal law, and the Court is not aware of any such doctrine regarding the creation of "de facto" partnership property. And even were there such a doctrine that would have created property interests in Shady Glen in a partnership such as GTP, the creation of such an interest, presumably upon the occurrence of a "wrong," i.e., the failure to transfer the property to the partnership while under some duty to do so, or the wrongful transfer of the property to a third party, seems exactly the sort of resulting or implied trust *ex maleficio* that numerous cases state is not a basis for liability under Section 523(a)(4). *See, e.g.*, *Rasgdale,* 780 F.2d at 795 .

---

[11] To the extent that Debra and Toby Hart claim that Debra or NHII "transferred" Shady Glen to GTP via the Purchase Agreement and Escrow Instructions dated August 6, 2006, that document, without a corresponding recorded grant deed, could not have effected a transfer of Shady Glen. Pls.' Trial Ex. 23-B. The document does not by its terms effect an immediate transfer nor could it without a grant deed. Cal. Civ.Code §§ 1091, 1092. *See May v. Commissioner,* 723 F.2d 1434, 1437 (9th Cir. 1984); *Brooks-Hamilton v. City of Oakland (In re Brooks-Hamilton),* 348 B.R. 512, 520-21 (Bankr. N.D. Cal. 2006). Moreover, for the reasons set forth below, the Court also finds Defendants' Exhibit 23-B to be neither a credible nor a genuine document. To the contrary, the Court is convinced that it is a forgery.

41

The Court believes that on the facts presented, the $800,000 that the limited partners contributed to GTP, $100,000 of which came from the Drews, constituted the trust "res" for GTP.[12]  In so concluding, the Court is mindful of the reasoning in the *Enea* case, in which the District Court concluded that the funds on hand in a limited partnership that were supposed to be spent toward the development of a real estate project did not constitute a "res," precisely because the funds were contributed under the assumption that they would be spent on the project.  *Enea,* 2013 WL 1209479 at *4-5.  Therefore, the Court reasoned, the funds were not impressed with any sort of trust, and there was no identifiable "res."

The Court believes that the facts of this case compel a different result.  Indeed, it was the very essence of the fraud in this case that the partnership was to (1) raise $3,600,000 in equity financing to achieve the purpose of the partnership, (2) not incur debt and (3) refund the limited partners contributions if the project were not fully subscribed.  Thus, the attraction of the project was precisely that it was to be risk-free: the partnership will have no debt, and "you'll get your money back if we don't raise all of the equity financing contemplated."  Under these circumstances, the Court believes that the funds contributed by the limited partners were, in essence, akin to a deposit into escrow, and the obligation to refund the moneys if the conditions precedent were not satisfied created a debtor/creditor relationship that differs materially from the situation presented in *Enea*.  *See Parker v. Community First Bank,* 123 F.3d at 1246 (finding a debtor-creditor relationship is created when a bank accepts a deposit) .

And, to the extent that there were any ambiguity created by the LPA as to when the funds were to have been raised (i.e., might they have been raised over an extended period of time?), that ambiguity was mooted by Debra's contemporaneous, and misleading, statements concerning the "closing" of the offering and the transfer of title of Shady Glen to GTP.  Therefore, the Court concludes that the funds contributed to GTP constituted the partnership "res."

Was there a defalcation on the facts presented?  The Court believes that there was.  A

---

[12] As stated previously, the Court has concluded that the $100,000 that the Drews advanced in March 2007, was a loan and not a purchase of a partnership interest.  Therefore, the Court is considering only the first $100,000 contribution to GTP under the rubric of Section 523(2)(4).

42

defalcation is defined as a failure to pay back or account properly for trust funds or money held in a fiduciary capacity. *Hemmeter*, 242 F.3d at 1190. Recently, the Supreme Court has clarified the mental state necessary for a fiduciary to be liable for a defalcation. In *Bullock v. Bank Champaign, N.A.*, 133 S. Ct. 1754 (2013), the Supreme Court held that a defalcation includes a state of mind "involving knowledge of, or gross recklessness in respect to, the improper nature of the relevant fiduciary behavior." *Id.* at 1757.

Although the Drews' $100,000 clearly was paid to GTP, and apparently was deposited into a GTP checking account, neither GTP, nor its general partner NHII, is able to return or to account for any portion of the $800,000 in equity capital raised, including the Drews' $100,000. And in light of the importance of the issue, there was remarkably little discussion at trial of the disposition of these funds. Toby testified both that he couldn't be sure where the funds were spent, i.e., that they might have been spent on projects unrelated to GTP, and that they were paid to NHII as a "partial payment" of the $2,000,000 due under the Land Purchase Agreement for transfer of Shady Glen to GTP.

Although it might seem obvious that use of the funds to finance projects other than GTP would constitute defalcation, the Court believes that, under the unique circumstances presented, any disposition of the $800,000 in cash contributions to GTP was wrongful. The GTP project was advertised as essentially risk-free because all funds necessary to complete the project were to come from equity financing; therefore the partners were to be safeguarded from the primary risk ordinarily associated with real estate projects, i.e., that the entity would default to a lender and the lender would exercise remedies. And the LPA also provided that the general partner would refrain from any action that would frustrate the partnership's ability to achieve its objectives. Pls.' Trial Ex. 11, at 11.

In this case, as of the date of the "closing" of the partnership offering, as described by Debra to the Drews, NHII, not GTP, was acquiring the Shady Glen property. The Shady Glen property in the hands of NHII was subject to a deed of trust securing a debt of $800,000, created on virtually the same date as the Drews made their investment. And, although they didn't know

43

it at the time, the Drews were apparently the first investors. Although it is not clear from the testimony, and no documents were produced to establish either (1) when the remaining $700,000 in cash contributions were made or (2) when the $800,000 was disbursed, or to whom it went, it is absolutely clear that at no time did the partnership have funds sufficient to pay the $2,000,000 purchase price for Shady Glen.[13] Indeed, at no time did GTP likely have even the funds necessary to pay off the debt secured against the Shady Glen property, debt that stood at $800,000 as of the date of the Drews investment, and that eventually increased via additional secured borrowing against Shady Glen, to more than $1,000,000 (and without, by the way, any apparent reductions reflecting payment of GTP's $800,000 for debt service). Pls.' Trial Ex. 16.

Under these circumstances, having raised insufficient capital to achieve even the initial purpose of the partnership (acquisition of Shady Glen) and knowing that NHII had liened up the property beyond GTP's financial ability to satisfy the underlying debt, it was pointless, and wrongful, for GTP to pay over any funds to NHII, for any purpose. Payment of GTP's capital under these facts created exactly the peril that the PPM, the SA and the LPA promised would be avoided – disbursement of partnership assets at risk of loss, because of a pre-existing debt. On these facts, the sole permissible actions would have been to hold the funds until such time as the purposes of the partnership might have been achieved (i.e., until all necessary funds had been raised) or refund the limited partners' money.

And, for all of the same reasons, the Court also believes that pay-out of the partnership's funds was, per *Bullock*, the equivalent of an intentionally wrongful act, or, at the minimum, an act that displayed a conscious and reckless disregard of a substantial and unjustifiable risk that the conduct would violate a fiduciary duty. *See Bullock,* 133 S. Ct. at 1759.

Turning to the last element under Section 523(a)(4), were either Debra or Lance fiduciaries of the Drews when the debt was created? The Court believes they were not, and the Drew's action against Debra and Lance for defalcation while acting in a fiduciary capacity fails

---

[13] There were no GTP bank records produced–they were also apparently stolen from 1100 Bancroft. Nor did any of the bank records for NHII produced during the trial reflect receipt of the $800,000, or what it was spent on once received.

44

accordingly.

It is clear to the Court that NHII, in its capacity as the general partner of GTP, was a fiduciary of the Drews at the time the debt was created, and that NHII's actions in causing GTP to disburse its equity capital constituted a defalcation. And although the Drews argue that Debra was also a limited partner in GTP, and therefore a partner of the Drews for Section 523(a)(4) purposes, by virtue of the fact that both she and Toby claimed in responses to discovery that Debra "bought-back" the limited partner interest of Donn and Jeannie McKnight, the Court notes that there was no documentary evidence presented that would establish (1) that the McKnights had a limited partnership interest in GTP, at any time, (2) much less that any transfer of such interest was made to Debra. The Court is not willing to deem Debra to be a limited partner in GTP on such a flimsy basis. There was no evidence that Lance was a partner in fact in GTP, at any time.

The Drews argue that both Debra and Lance should be "deemed" to be acting in a fiduciary/trust relationship with them by virtue of (1) the application of the alter ego doctrine to the relationship between and among NHII and Debra and Lance, and (2) the application of the doctrine that an officer or director of a corporation who commits, participates in or acquiesces in a wrongful act is himself liable for that act. The Court rejects both arguments.

The determination whether to pierce the corporate veil and hold a shareholder personally liable for corporate debts is based on three factors: "the amount of respect given to the separate identity of the corporation by its shareholders, the degree of injustice visited on the litigants by recognition of the corporate entity, and the fraudulent intent of the incorporators." *Board of Trustees v. Valley Cabinet & Mfg. Co.*, 877 F.2d 769, 772 (9th Cir. 1989)(quoting *Seymour v. Hull & Moreland Eng'g*, 605 F.2d 1105, 1111 (9th Cir.1979)). *See also*, *In re Tobin*, 258 B.R. 199, 204 (B.A.P. 9th Cir. 2001) (finding chapter 7 debtor's liability for state court judgment for fraud based based on alter ego theory undisputed, but section 523(a)(2)(A) does not render debt nondischargeable). Disregard of the corporate entity is the exception to the norm. *Tobin*, 258 B.R. at 204. And "evidence establishing shareholder disrespect for a corporation's separate

45

identity alone is an insufficient reason to pierce the corporate veil." *Board of Trustees*, 877 F.2d at 773 (citing *Audit Serv. v. Rolfson*, 641 F.2d 757, 764 (9th Cir. 1981)). Proof of fraudulent intent may refer either to the intent of the incorporators in forming the corporation, or post-incorporation misuse of the corporate form. *Board of Trustees*, 877 F.2d at 773-74.

As an initial matter, the Court notes that there is no dispute but that at the time of the creation of the partnership debt, July 2004, Debra and Lance were both officers and directors of, and equity holders in, NHII, the general partner of GTP. The Drews argue that these facts, along with the facts that (1) NHII had its office at Debra and Toby's house, (2) the corporation was initially not capitalized via any equity investment by the Harts, (3) NHII apparently did not record formal minutes of corporate meetings, (4) the Harts each apparently put funds into NHII from time to time (Debra, using NHII as a vehicle to minimize tax liability, regularly put her commissions into NHII, Lance put the "profit" from one of his projects into NHII, and each of the Harts claimed to loan NHII moneys from time to time, without receiving notes therefore), and took funds out from NHII from time to time (though moneys paid to Lance appear to have been as compensation for services rendered), and (5) NHII touted each of their respective experience and areas of expertise in "selling" the NHII "team" result in the Harts having misused the corporate form. The Drews claim that it would be unjust to permit the Harts to hide behind NHII, especially in light of the fraudulent acts and breaches of fiduciary duty for which they allege NHII is liable.

The Court is not convinced that the evidence referred to above is sufficient to demonstrate a systemic disregard of the corporate form of NHII, as of the time of the formation of GTP and the incurring of debt to the Drews. There was no initial capitalization of NHII in 2002, but it is far from clear that a substantial amount of capital would have been necessary to commence this business responsibly – and Lance and Debra each contributed substantial amounts of their own funds later. There may not have been formal minutes of meetings – but there was testimony that these family members had meetings, when necessary, to discuss NHII's affairs. Money might have come in and gone out of NHII with relatively informality, but there was no

46

sense that, prior to the creation of GTP and the transaction with the Drews, any creditor of NHII was disadvantaged by the informal nature of the company's book-keeping. In short, the Court believes that the relationship between and among NHII, Lance and Debra is relatively typical of family held businesses, and the Court is reluctant to conclude, based on the evidence presented, that NHII, Debra and Lance should be deemed to be one and the same, based on a pre-GTP failure to follow corporate formalities.

Moreover, the Court does not believe that it has been presented with any evidence that the Harts initially formed NHII with a fraudulent intent. To the contrary, the undisputed evidence shows that NHII was formed in 2002 for the non-nefarious purpose of minimizing Debra's tax liability; and that not long after its inception, the Harts began to use NHII, again without any hint of fraud or abuse, as a vehicle to provide normal corporate-entity protections in connection with real estate projects. There is simply no evidence that the Harts deliberately mis-used the corporate form prior to the transactions that are the subject of this litigation.

Nor is the Court persuaded that, as the Drews assert in the first cause of action in their First Amended Complaint, GTP was, from the outset, a complete sham formed for the sole purpose of fleecing the Drews and other investors into financing the construction of Debra's dream house at Shady Glen. While the Court certainly found that Debra (and Toby) made false statements and created false pretenses with respect to the financing of GTP, and did so intentionally and with knowledge of the falsity of their statements, the Court has simply not seen evidence of the sort of pre-meditated, malicious scheming that would support a finding that the Harts, from the date of formation of GTP, never intended to have the partnership fulfill its asserted business purpose. Accordingly, the Court does not find sufficient grounds to pierce the NHII corporate veil with respect to Debra or Lance, as of the formation of GTP.

And this finding ends the inquiry because, in order to find liability under Section 523(a)(4), the Court must find that the debtor was a fiduciary as of the time of the creation of the debt. *Niles*, 106 F.3d at 1459. For this reason, a trust relationship that is created not at the outset of the relationship between the debtor and his victim, but one that arises later, as a consequence

47

of the debtor's wrongdoing, is not sufficient to invoke the provisions of Section 523(a)(4). *Id.* Applying this principle to the alter ego doctrine, it is clear that a finding that the debtor is the alter ego of a defalcating fiduciary will, in virtually all cases, lead to the conclusion that the debtor cannot be liable under Section 523(a)(4). This is so, as the Bankruptcy Court concluded, and the District Court affirmed, in *Enea*, precisely because the alter ego doctrine typically attempts to rectify an unjust result based upon the fraud or wrongful conduct of the debtor and the corporate entity which he has abused. *Enea,* 2013 WL 1209479 at *3-4. The doctrine is imposed therefor, in exactly the sort of *ex maleficio* circumstances that the statute excludes from coverage. *Id.* While it might theoretically be possible to avoid this result in the rare case in which the corporate entity is, from the outset, a complete sham and an abuse of the corporate form, such that the fraudulent intent may be discerned from the formation of the entity, as the Court indicated earlier, that was not the case here. The Drews' arguments under the alter ego doctrine fail.

The Drews' arguments based on Debra and Lance's status as corporate officers of NHII fare no better. As an initial matter, while there is no dispute but that Lance was a shareholder, officer (CFO) and director of NHII at all times relevant hereto, there was substantial dispute as to whether Debra was an officer or shareholder of NHII after May 2006 when she testified she transferred her equity interests in NHII to Toby, and resigned her position as Secretary of NHII. Although not necessary *per se* to the Court's disposition of the issue whether Debra is liable under Section 523(a)(4), the Court wishes to set forth its findings on this question for reasons that go beyond the disposition of this adversary proceeding.

The Court finds several reasons to doubt the testimony of Toby and Debra on the question when Debra transferred her equity interest and resigned her officer position at NHII.

First, the Court notes that the Drews presented evidence that Lance, the Secretary of NHII, filed a "Statement of Information" with the California Secretary of State's Office on July 6, 2006, attesting that there had been "no changes" in the management or ownership of NHII in the year prior to the filing, contradicting Debra and Toby's assertion that Debra had transferred

48

her interest in NHII and resigned as an officer in May 2006.  Pls.' Trial Ex. 136.

Second, the document that Debra produced to demonstrate that she had relinquished her shares in NHII, Defendants' Exhibit 23-A, a stock certificate reflecting the issuance of the shares in October 2002 on the front page, and her transfer of the shares in May 2006 on the back page, is highly suspect.  In fact, the document appears to be a forgery, since the front page reflecting issuance of the shares in 2002 is signed by Toby, as "President" of NHII, a role that even he does not claim to have assumed until years later.

Third, another document produced by the Harts, Defendants' Exhibit 23-B, a handwritten Vacant Land Purchase Agreement and Escrow Instructions, dated as of August 5, 2006 (the "August 5 Agreement"), is also highly suspect, for a number of reasons.

First, the August 5 Agreement describes transactions involving Shady Glen that are at odds with the conditions prevalent at the time of execution.  The Agreement provides for the purchase of Lots A and B for the combined purchase price of $3.5 Million.  This is flatly inconsistent with the facts that (1) the purchase price for Lot A was $1.2 Million, as set forth in that certain Vacant Land Purchase Agreement, etc., dated as of July 14, 2006, between NHII as Seller and Debra as Buyer (and the testimony of the Defendants at trial that the purchase price for Lot A was $1.2 Million), and (2) the purchase price for Lot B was also $1.2 Million, as set forth in the testimony of the Defendants at trial, for an aggregate purchase price of $2.4 Million for Lot A and Lot B.  Pls.' Trial Ex. 32.  There is no logical commercial reason for Debra to have agreed, in August 2006, to pay $1.1 Million more for Shady Glen than she had contemporaneously agreed to pay for it.  And to the extent that the August 5 Agreement purports to have any legal effect, it is curiously not mentioned in either the Land Purchase Agreement, nor the Grant Deeds transferring Lot A and Lot B to Debra, executed as of September 6, 2006 and August 1, 2006, respectively, nor in any other  contemporaneous writing.  Pls.' Trial Ex. 32, 35, 33.

In another unexplained oddity the August 5 Agreement provides for Debra's purchase of Lot B from NHII, notwithstanding the fact that that purchase had been accomplished by Grant Deed dated August 1; for the same reason, the Agreement's reference to NHII as the "owner" of

49

Shady Glen as of August 5 is inexplicably inaccurate. Pls.' Trial Ex. 35.

The August 5 Agreement also refers (at paragraph 10) to the fact that Debra sold her shares in NHII to Toby on May 6, 2006, and is no longer an officer or shareholder in NHII. There is no reason, other than an intention to manufacture a "record" of this purported transaction, for the August 5 Agreement to make any reference to Debra's alleged transfer of her shares or resignation of her officer status.

Most curiously, this document, unlike the vast majority of presumably probative documents regarding GTP and NHII, which were allegedly stolen from a shed on the property of a business associate of Toby's, appears to have been "discovered" by the Harts, in the attic of their house, well after the commencement of this litigation. For this reason, the August 5 Agreement was not produced in discovery in time for Plaintiffs to be able to depose Debra and Toby about its contents.

And lastly, when presented with a copy of the August 5 Agreement during his trial testimony, Lance, a shareholder, officer and director in NHII, testified that he could not recall having seen the document previously.

The Court is convinced that this document is a forgery.

Moving on to the merits, the Court does not believe that the Drews can demonstrate that Lance or Debra may be liable for NHII's defalcation with respect to the disbursement of GTP's cash. As an initial matter, courts have "consistently stated that a corporate executive will not be held vicariously liable, merely by virtue of his office, for the torts of the corporation." *Murphy Tugboat v. Shipowners & Merchants Towboat*, 467 F.Supp. 841, 852 (citing *Tillman v. Wheatin-Haven Recreation Ass'n, Inc.,* 517 F.2d 1141, 1144 (4th Cir. 1975); *Martin v. Wood*, 400 F. 2d 310, 313 (3rd Cir. 1968)) *aff'd sub nom*, Murphy Tugboat Co. v. Crowley, 658 F.2d 1256 (9th Cir. 1981), *cert. denied*, 455 U.S. 1018 (1982)). Rather, "[p]ersonal liability must be founded on specific acts by the individual officer or director." *Murphy Tugboat*, 467 F.Supp. at 852 (citing *Davis H. Elliott Co. v. Caribbean Utilities Co., Ltd.,* 513 F.2d 1176, 1182 (6th Cir. 1975)). Therefore, an officer or director is, in general, personally liable for all torts which he authorizes

50

or directs, or in which he participates, notwithstanding that he acted as an agent of the corporation and not on his own behalf. *Murphy Tugboat*, 467 F.Supp. at 852.

Applying this rule to the context of actions under Section 523(a)(4), the Bankruptcy Appellate Panel in *Baird* determined that a debtor who was the corporate officer who was responsible for disbursing funds from a trust held by the corporation was liable for a misapplication of the trust funds. *See Baird,* 114 B.R. at 204-05.

However, *Baird* is distinguishable on its facts from the present situation. In contrast to *Baird*, in which it was clear that the debtor was the sole person with authority to disburse, and who in fact did disburse, funds from a trust account, the only evidence offered at trial on the question who had the authority to disburse, and who did disburse funds from the GTP account was Toby's testimony that he was the sole person with such authority. There was no evidence that either Lance or Debra had any such authority, nor that they even knew of, let alone participated in, or acquiesced in, a disbursement of trust funds from GTP. *See Murphy Tugboat*, 467 F.Supp. 852. Nor, for that matter, was there any certainty when the funds were disbursed, let alone where they were directed. The Court cannot find either Lance or Debra liable as corporate officers and directors of NHII for GTP's wrongful disbursement of funds, as apparently caused by NHII, its general partner.

Nor is it legally significant that Lance, as CFO of NHII, was the sole person at NHII with the authority to disburse funds from NHII accounts. To the extent that NHII came into possession of GTP funds via a transfer from GTP presumably engineered by Toby, as the Court stated previously, the defalcation occurred when GTP parted with the funds under conditions that were at variance with the express representations of the PPM, the SA, the LPA and the Harts own oral statements. What happened to the funds thereafter is, for purposes of this litigation, not relevant. And even if disbursements of funds from NHII's checking account, as authorized by Lance, were improper, that would not lead to liability for Lance under Section 523(a)(4), because as the Ninth Circuit recognized in *Cantrell*, corporate officers in California corporations do not act as fiduciaries for the assets of the corporation, because California corporations do not hold

51

their assets in trust for their shareholders.  *See Cantrell*, 329 F.3d at 1125-27; *Enea*, 2013 WL 1209479 at *4.

## 2. Embezzlement

Finally, the Drews seek to have excepted from discharge under Section 523(a)(4) any debt from Debra or Lance for money provided by the Drews, based on the theory that Debra, Lance or NHII committed embezzlement.  The three elements of embezzlement are: "(1) property rightfully in the possession of a non-owner; (2) non-owner's appropriation of the property to a use other than which it was entrusted; and (3) circumstances indicating fraud."  *In re Littleton*, 942 F.2d 551, 555 (9th Cir. 1991) (quoting *In re Hoffman*, 70 B.R. 155, 162 (Bankr. W.D. Ark. 1986)).

As pled, embezzlement is vaguely set forth with respect to any specific transaction.  The First Amended Complaint states "[t]o the extent that any of Plaintiff's money or any of the GTP assets were lawfully possessed by [Debra, Lance or NHII] the subsequent fraudulent or wrongful diversion of the money or property by [Debra or Lance] which deprived GTP or Plaintiffs of rightful possession thereof constituted embezzlement."  First Am. Compl. For Money Owed and Non-Dischargeability, at 15-16, Dec. 17, 2012, Case No. 11-04175, ECF No. 87-1.  The First Amended Complaint also asserts that because the embezzlement was kept secret from Plaintiffs, they could not have discovered the facts revealing the embezzlement until 2010.  *Id*. at 20.

As stated in connection with the discussion of the defalcation claim, there is no evidence that either Debra or Lance came rightfully into possession of either the funds from the July 2004 Investment, or the March 2007 Advance.  Nor is there any evidence that either Debra or Lance appropriated the Drews' moneys or GTP's nor that they were ever in a position to do so; rather, what little evidence that was adduced on the question of control of GTP's funds suggested that only Toby had the right and the ability to control those assets.  The claim for embezzlement accordingly fails.

For the record, even were the Court to conclude that the elements of embezzlement were met here, this cause of action would also be subject to a statute of limitations defense.  The

52

statute of limitations in California for embezzlement is also three years. *Minichino v. Wells Fargo Bank, N.A.*, 2011 WL 4715153 at *5 (N.D. Cal. Oct. 7, 2013) (citing Cal.Civ.Proc.Code § 338(c)(1)). The Plaintiffs assert that they could not have discovered the fraud underlying the embezzlement until 2010. However, the Court believes that the same facts that were revealed in May 2007, and that placed the Plaintiffs on inquiry notice then of the fraud surrounding the July 2004 Investment and the March 2007 Advance would also have been sufficient to create inquiry notice about embezzlement of the Drews' or GTP's money or property.

Accordingly, Plaintiffs shall take nothing by this cause of action.

## CONCLUSION

For all of the above-cited reasons, the Court rules that Plaintiffs shall take nothing by way of their Complaint against Debra Hart, Lance Hart and NHII, and that the debts set forth in the First Amended Complaint as owing by Defendants to Debtors are dischargeable.

Ordinarily, that would end the matter. The Court is, of course, duty bound to apply the law, even where the facts are noxious and the result jarring; and there is no question in the Court's mind that the "correct" legal answer to this dispute is that the Defendants are not liable to Plaintiffs on fraud claims, based upon Plaintiffs' failure timely to assert their rights, nor on defalcation or embezzlement claims, based upon the unique facts of this case.

As should be apparent from the Court's discussion, however, the Court is convinced not only that there was ample evidence that Toby and Debra Hart committed numerous fraudulent acts against the Plaintiffs, which are being excused, legally, but that both Debra and Toby perpetuated their fraud before this Court by the presentation of oral testimony that was demonstrably, even defiantly, false. Were the Court's concerns limited to the contents of oral testimony, there might be a temptation to view Debra and Toby's statements as the product of a "he said, she said" dispute, and conclude the matter, for the sake of repose. But, as the Court also indicated, the Court is firmly convinced that two of the exhibits offered by Debra, Nos. 23-A and 23-B, are complete forgeries that were fabricated for the purpose of exculpating her from questionable activities regarding Shady Glen, and were presented as evidence in a federal court in

53

a matter involving the most serious charges of fraud and defalcation by a fiduciary.

Of more lasting import than the disposition of any particular dispute is the Court's abiding responsibility to preserve the integrity of its process. That process is clearly threatened where, as here, parties knowlingly present to the Court false documents in an effort to influence, wrongly, the Court's fact finding. Accordingly, the Court has concluded that it is appropriate to inform the Office of the United States Trustee ("UST") of its findings and conclusions in this matter, including that Debra and Toby Hart appear knowingly and fraudulently to have created and presented false documents to the Court during the course of this trial to exculpate Debra from liability on serious claims of non-dischargeability of debt, so that the UST may refer the matter to the United States Attorney, for investigation and, if appropriate, criminal prosecution.

Beyond that, the Court is also mindful of the fact that Debra and Toby, as licensed real estate agents in California, hold positions that require them to act as fiduciaries to their potential clients, and that implicate the highest duties of honesty, candor and selflessness. The Court also believes it appropriate to share its findings and conclusions herein with the California Department of Real Estate ("DRE") the licensing body with authority to review the conduct of Debra and Toby Hart, so that they may take any action they deem appropriate

The Court accordingly will order that a copy of this Memorandum Decision be served upon the DRE and the UST.

*END OF MEMORANDUM DECISION*

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

COURT SERVICE LIST

Gary Drew
1605 Cervato Circle
Alamo, CA 94507

Janette Drew
1605 Cervato Circle
Alamo, CA 94507

Steven J. Hassing
Law Offices of Steven J. Hassing
425 Calabria Court
Roseville, CA 95747

Debra A. Hart
125 Canada Via
Diablo, CA 94528

Clyde E. Hart
125 Canada Via
Diablo, CA 94528

Lance E. Hart
798 Hutchenson Rd.
Walnut Creek, CA 94598

Baron J. Drexel
Law Offices of Baron J. Drexel
212 9th St. #401 Penthouse
Oakland, CA 94607

U.S. Trustee
Office of the U.S. Trustee
1301 Clay St. #690N
Oakland, CA 94612

California Department of Real Estate
Consumer Protection (Oakland Office)
1515 Clay St., Suite 702
Oakland, CA 94612